**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| BOOTHBAY ABSOLUTE RETURN STRATEGIES, LP, BOOTHBAY DIVERSIFIED ALPHA MASTER FUND, LP, CORBIN HEDGED EQUITY FUND, L.P., CORBIN ERISA OPPORTUNITY FUND, LTD., PINEHURST PARTNERS, L.P., FW DEEP VALUE OPPORTUNITIES FUND I, LLC, FOURWORLD GLOBAL OPPORTUNITIES FUND, LTD., and FOURWORLD EVENT OPPORTUNITIES, LP, <br><br> Plaintiffs, <br><br> v. <br><br> BELGISCHE SCHEEPVAARTMAATSCHAPPIJ-COMPAGNIE MARITIME BELGE SA, <br><br> Defendant. | Case No. 24-1445 <br><br> **COMPLAINT** |

Plaintiffs Boothbay Absolute Return Strategies, LP ("BBARS"), Boothbay Diversified Alpha Master Fund, LP ("BDA"), Corbin Hedged Equity Fund, L.P. ("CHEF"), Corbin ERISA Opportunity Fund, Ltd. ("CEOF"), Pinehurst Partners, L.P. ("Pinehurst"), FW Deep Value Opportunities Fund I, LLC ("FWDV"), FourWorld Global Opportunities Fund, Ltd. ("FWGO"), and FourWorld Event Opportunities, LP ("FWEO," and collectively with BBARS, BDA, CHEF, CEOF, Pinehurst, FWDV, and FWGO, "FourWorld" or "Plaintiffs"), by their undersigned attorneys, for their complaint against Belgische Scheepvaartmaatschappij-Compagnie Maritime Belge SA ("CMB"), allege with knowledge as to themselves and their own actions, and otherwise on information and belief, as follows:

## INTRODUCTION

1.      On February 14, 2024, CMB disseminated materially false and misleading offering materials to FourWorld in connection with CMB's mandatory takeover offer for shares in the Belgian shipping company Euronav NV ("Euronav").  The offering materials were disseminated pursuant to a Schedule TO and accompanying documents filed with the Securities and Exchange Commission ("SEC") along with a Prospectus dated February 13, 2024 (collectively, the "Offering Documents"), and were designed to deceive Euronav's stockholders into believing that the offering price ($17.86) was properly based on the price that CMB paid when it bought enough shares to become the controlling stockholder of Euronav, as required by Belgian law.  That is false.  In fact, CMB paid much more for its shares.  By concealing the truth, CMB seeks to avoid paying the same price to the minority shareholders.

2.      According to a former senior executive of Euronav ("Confidential Informant A"), a key piece of the value that CMB paid for its shares was to obtain the dismissal of an arbitration that Euronav had filed against the seller, which was a company called Frontline plc ("Frontline"). The Offering Documents pay lip service to the existence of the arbitration, but they conveniently leave out the fact that Euronav had an open-and-shut case against Frontline worth as much as EUR 600 million.  Frontline was not paid only the cash purchase price for its shares.  Dismissing the arbitration paid material additional consideration to Frontline at the expense of Euronav's minority shareholders—as much as *$2.96* per Euronav share.

3.      That is not all.  As part of the same series of interconnecting transactions, CMB also caused Euronav to sell a fleet of ships to Frontline below market value.  The cut-rate price provided further consideration to Frontline for its shares.  In the shipping business, a buyer of a fleet of ships pays a premium to the ships' individual net asset values.  Not Frontline.  CMB caused Euronav to sell 24 tankers to Frontline for $2.35 billion, which represented the ships' net

asset value, with no premium at all.  This was another key component of value to Frontline in exchange for surrendering its Euronav shares.  Here, too, CMB pays lip service to the existence of the fleet sale but does not disclose that it arranged this sweetheart deal to provide additional value to Frontline—value that should have been included in determining the mandatory tender offer price.

4.      CMB then caused Euronav to use the proceeds from the below market fleet sale to acquire CMB's subsidiary, CMB.Tech, at an above-market price—a 9% premium over the net asset value of CMB.Tech's fleet.  Confidential Informant A believes the acquisition of CMB.Tech's aging fleet did not provide *any* value to Euronav.  The Offering Documents fail to explain why Euronav purchased the CMB.Tech fleet or the basis for the price.

5.      FourWorld submitted written questions to Euronav about each of these transactions in advance of the relevant shareholder meeting to consider their approval.  No substantive response or amended disclosures were ever provided, forcing FourWorld to file the instant lawsuit to obtain the requisite information before determining whether to participate in the pending tender offer.

6.      CMB's false and misleading disclosures described herein constitute a violation of Section 14(e) of the Securities Exchange Act of 1934 (the "Exchange Act").  FourWorld brings this action seeking declaratory and injunctive relief to prevent CMB from closing its tender offer (hereinafter, the "Tender Offer"), currently scheduled to expire on March 15, 2024, on the basis of the false and misleading Offering Documents.   Declaratory and injunctive relief from this Court is necessary to ensure that Euronav's U.S.-based shareholders, including FourWorld, are not forced to decide whether to accept CMB's offer without accurate information concerning, among other things, the true value that CMB paid Frontline for its Euronav shares.

3

## PARTIES AND RELEVANT NON-PARTIES

7.      Plaintiff BBARS is an investment fund managed by FourWorld Capital Management, LLC. At the time of the Tender Offer, BBARS held over 500,000 U.S.-listed shares of Euronav stock.

8.      Plaintiff BDA is an investment fund managed by FourWorld Capital Management, LLC. At the time of the Tender Offer, BDA held over 250,000 U.S.-listed shares of Euronav stock.

9.      Plaintiff CHEF is an investment fund managed by FourWorld Capital Management, LLC. At the time of the Tender Offer, CHEF held over 25,000 U.S.-listed shares of Euronav stock.

10.     Plaintiff CEOF is an investment fund managed by FourWorld Capital Management, LLC. At the time of the Tender Offer, CEOF held over one million U.S.-listed shares of Euronav stock.

11.     Plaintiff Pinehurst is an investment fund managed by FourWorld Capital Management, LLC. At the time of the Tender Offer, Pinehurst held over 500,000 U.S.-listed shares of Euronav stock.

12.     Plaintiff FWDV is an investment fund managed by FourWorld Capital Management, LLC. At the time of the Tender Offer, FWDV held over two million U.S.-listed shares of Euronav stock.

13.     Plaintiff FWGO is an investment fund managed by FourWorld Capital Management, LLC. At the time of the Tender Offer, FWGO held over 600,000 U.S.-listed shares of Euronav stock.

14.     Plaintiff FWEO is an investment fund managed by FourWorld Capital Management, LLC. At the time of the Tender Offer, FWEO held over 55,000 U.S.-listed shares of Euronav stock.

15.     Defendant CMB is a public limited liability company organized under Belgian law and registered under enterprise number BE0404.535.431, with its principal place of business located at De Gerlachekaai 20, 2000, Antwerp, Belgium.  CMB also does business as Compagnie Maritime Belge NV.

16.     CMB is a family-owned shipping and clean technology group owned by the Saverys family.  At the time of the Tender Offer, CMB owned 107,905,344 shares (49.04%) in Euronav individually and 125,720,460 (57.14%) jointly with its affiliates.

17.     Non-party Euronav is a Belgian public limited liability company, with its principal place of business located at De Gerlachekaai 20, 2000, Antwerp, Belgium.  Euronav is a provider of international shipping and offshore services.  It owns and operates crude tankers. Euronav's shares are listed on the Euronext Brussels and the New York Stock Exchange under the ticker symbol "EURN."  Accordingly, Euronav offers both U.S. shares and Belgian shares to the public investors.  The U.S. shares are currently registered under Section 12(b) of the Exchange Act.

18.     Non-party Frontline is a public limited company organized under the laws of Cyprus, with its principal place of business located at 8 IRIS Building, 7th floor, Office 740B, 3106, Limassol, Cyprus.  Frontline is a Norwegian shipping company controlled by John Fredriksen.  Frontline agreed to merge with Euronav in April 2022, and later reneged on that agreement.  It subsequently completed a purchase of 24 VLCC (very large crude carrier) vessels from Euronav for $2.35 billion.

5

19.     Non-party Famatown Finance Limited ("Famatown") is a limited company organized under the laws of Cyprus, with its principal place of business located at 33 Promachon Eleftherias Street, Ayios Athanasios, 4103 Limassol, Cyprus.  Famatown is an affiliate of Frontline as it is also controlled by John Fredriksen.

20.     Non-party CMB.TECH NV ("CMB.Tech") is a private limited liability company organized under Belgian law, with its principal place of business located at De Gerlachekaai 20, 2000, Antwerp, Belgium.  CMB.Tech builds and operates hydrogen solutions and infrastructure and owns hydro-powered crew and personnel transfer vessels.  On December 22, 2023, Euronav announced that it would acquire 100% of the shares of CMB.Tech from CMB.  This acquisition was approved at the February 7, 2024 shareholder special general meeting—a formality, since CMB was Euronav's majority shareholder—and was completed on February 8, 2024.

## JURISDICTION AND VENUE

21.     This action arises under Section 14(e) of the Exchange Act (15 U.S.C. § 78n(e)), and the rules and regulations promulgated thereunder.

22.     Jurisdiction over the subject matter is based on 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

23.     Personal jurisdiction over CMB is based on Section 27 of the Exchange Act (15 U.S.C. § 78aa).  Further, CMB is subject to personal jurisdiction in this district, among other reasons, because this action arises out of and relates to CMB's Tender Offer for the shares of Euronav, an NYSE-traded company with shareholders residing in this district, and because CMB's transactions with Euronav has effects that can reasonably be expected to be visited upon shareholders residing in this district.

24.     Venue in this district is proper pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391.

## FACTS

### A.    A Failed Merger Between Euronav and Frontline Sparks a Deadlock Between Euronav's Two Largest Shareholders

25.    On April 7, 2022, Euronav and Frontline announced plans to merge the companies in order to create a new entity under the name of Frontline.

26.    Under the terms of the planned merger, Frontline would acquire all 201.7 million Euronav shares through a share-for-share acquisition at an exchange ratio of 1.45x Frontline shares per Euronav share, and Euronav shareholders would own approximately 59% of the surviving entity.

27.    The post-merger company was expected to operate 146 vessels with a combined market capitalization of over $7 billion, and incremental synergies were expected to be at least $60 million per year.  The merger was expected to be highly beneficial to Euronav and Euronav shareholders.

28.    The merger was approved by a unanimous vote of each company's board of directors and was expected to close in the fourth quarter of 2022 after Frontline completed a relocation to Cyprus.

29.    In July 2022, CMB communicated its dissatisfaction with the planned merger, and on December 13, 2022, officially requested termination of the deal.

30.    Despite having no right to withdraw from the merger under the merger agreement, Frontline purported to do just that on January 9, 2023.

31.    On January 28, 2023, Euronav filed a claim for arbitration against Frontline for breach of the merger agreement and sought damages from Frontline.  Euronav's arbitration claim was a slam dunk because Frontline had no ability to terminate the deal under the merger

agreement.  The drop in value of Euronav's shares that corresponded to the termination represented hundreds of millions of Euros in damages.

32.     On March 23, 2023, CMB called a special general meeting ("SGM") of Euronav shareholders.  During the SGM, Euronav's supervisory board (the "Supervisory Board") was expanded from five to seven members. Four new Supervisory Board members were installed.

33.     Of the four new Supervisory Board members, two were affiliated with the Saverys family and CMB, including CMB's majority holder Marc Saverys, and two were affiliated with Fredriksen and Frontline, including Frontline board member and majority holder John Fredriksen.  CMB and Frontline were Euronav's dominant shareholders, but they deadlocked over their competing visions for Euronav's future.

**B.     Euronav, CMB, and Frontline Agree to a Three-Part Transaction**

34.     On October 9, 2023, Euronav announced a three-part bilateral transaction (the "3P Transaction") with Frontline and CMB, which Euronav presented as a deal that puts an end to the deadlock between CMB and Frontline arising from their entrenched differences over strategy, while offering other shareholders the opportunity to realize cash value.  The 3P Transaction comprises three interdependent agreements: a Share Sale, a Fleet Sale, and a Settlement Agreement.

35.     CMB and Frontline, which collectively controlled a majority of the share votes, approved the 3P Transaction at an SGM held on November 21, 2023.  This SGM heralded a change in control of Euronav, with CMB emerging as the new controlling shareholder. Following the SGM, four members resigned from the Supervisory Board, including John Fredriksen and another member affiliated with Frontline.  Euronav's new board also ousted four Euronav executives: Euronav's interim CEO, COO, Chief People Officer, and Head of IR.  The

Euronav board replaced the ousted executives with people affiliated with CMB, including Alexander Saverys who became the new Euronav CEO.

36.     Pursuant to the Share Sale agreement, which was declared unconditional on November 22, 2023, CMB acquired Frontline's (6.21%) and Frontline's affiliate Famatown's (19.91%) shares in Euronav for $18.43 per share.  The Share Sale resulted in CMB owning 49.05% of share capital representing 53% of voting rights in Euronav, which triggered a mandatory takeover offer under Belgian law, discussed more fully below.

37.     Pursuant to the Fleet Sale agreement, Frontline acquired 24 VLCC (very large crude carrier) tankers from Euronav for $2.35 billion, which equals an average payment per ship of $98 million.  The Fleet Sale resulted in Frontline more than doubling its VLCC fleet and controlling approximately 5.1% of the global VLCC fleet.  Notwithstanding that the Fleet Sale allowed Frontline to increase its fleet size by a substantial amount in order to participate in an expected super cycle in the tanker market, it was priced at or within 1-2% of the net asset value, rather than applying a premium to the tankers' net asset value.

38.     Pursuant to the Settlement Agreement, Euronav's pending arbitration against Frontline for unilaterally terminating the merger was voluntarily dismissed with no cash compensation for Euronav.

39.     The Fleet Sale and Settlement Agreement required approval of an independent committee because Frontline is considered a related party.  A committee of three independent board members of Euronav's Supervisory Board was convened.

40.     The independent committee's report concluded that the arbitration claim had "high chances of success" and, based on input from legal counsel and an independent expert, deemed the potential compensatory damages to be "very substantial":

> The consistent advice from legal counsel that the Company has obtained (including from its regular counsel advising on the arbitration as well as Omega Law, an independent legal counsel consulted by the Committee) confirms the high chances of success for the Company's claim that the Combination Agreement was unlawfully terminated by Frontline.

> The amount of potential compensatory damages to which the Company may be entitled, has been quantified by the Company with the assistance of an expert in economic matters and the legal counsels. The expert and legal counsels have confirmed that this claim would be very substantial.

Even though the amount of potential compensatory damages had been "quantified," the report did not disclose the amount beyond stating that they were "very substantial." The independent committee evidently concluded that abandoning this claim for "very substantial" damages was needed to resolve the deadlock between CMB and Frontline—i.e., to persuade Frontline to sell out and cede control to CMB.

41.     According to Confidential Informant A, a former executive at Euronav, the economic expert estimated the value of the claim between EUR 500 million and EUR 600 million.

42.     In assessing the Fleet Sale, the independent committee again focused on the strategic deadlock among the CMB and Frontline factions. In its report, the independent committee acknowledged that the Fleet Sale "does not fit within the strategy most recently communicated by the Company. To the contrary, the Fleet Sale impedes a strategy of consolidation in the crude oil transportation market" and "is less aligned with its sustainability ambitions and which will substantially affect the annual efficiency ratio of the Euronav fleet."

43.     This change in strategy appears to be a pretext for CMB and Frontline to push through the Fleet Sale. It was not revealed until the February 7, 2024 SGM that there had been no discussion of a new strategy by Euronav's board at the time of negotiating the Fleet Sale. In particular, the independent committee did not examine the possible impact of massively

increasing the size of the fleet of a direct competitor, and the loss of the clients linked to the vessels.

44.     Ultimately, the independent committee advised the Supervisory Board to accept the Fleet Sale and the Settlement Agreement only because they were considered more favorable than a continued deadlock.  It is therefore clear that the Fleet Sale and dismissal of the arbitration were part of the value provided to Frontline in exchange for its agreement to sell its stake to CMB and exit the scene.

45.     CMB's silence on these critical issues in the Offering Documents was no oversight.  Plaintiffs twice asked CMB representatives about these issues without ever receiving a substantive response.

46.     Prior to the November 21, 2023 SGM shareholder meeting, Plaintiffs' Belgian counsel sent a written letter to the board of Euronav asking questions related to, among other things, the valuation of the Fleet Sale, the rationale and negotiation behind the Settlement Agreement, the monetary assessment of the arbitration claims, and the change in strategy.  At the November 21, 2023 SGM, Euronav failed to substantively address any of Plaintiffs' questions, simply referring to the upcoming prospectus to be published by CMB in February 2024, in connection with the Tender Offer.  The board also refused to provide the annexes to the report of the independent committee, even though they were described as an integral part of the report.

47.     After CMB took control of the board of Euronav, Plaintiffs reiterated its request for this information in another written submission to Euronav in advance of the February 7, 2024 SGM and expressed concern for minority shareholders' inability to make a well-informed decision without that information.  In response, Euronav (now controlled by CMB) again refused to answer Plaintiffs' questions and instead simply referred Plaintiffs to deal documents and an

investor's day presentation that were available online and the upcoming prospectus to be issued

by CMB.  Despite knowing that Euronav's shareholders had repeatedly sought disclosure of

material information regarding the dismissal of the arbitration and the Fleet Sale to help them

fairly assess the offering, CMB still chose to omit that information from the Offering

Documents.

> **C.    Euronav Acquires CMB.Tech**

48.    On December 22, 2023, Euronav announced that it would acquire CMB.Tech for

$1,150 million in cash.

49.    Because CMB holds more than 50% of the voting rights of Euronav, the

acquisition was a related party transaction and required an independent committee review,

including a fairness opinion.

50.    The independent committee recommended approval of the CMB.Tech transaction

and determined that it would not require any debt financing because the proceeds from the Fleet

Sale would be used for the acquisition.  The Supervisory Board approved the transaction.

51.    The fairness opinion was completed by Degroof Petercam, which valued

CMB.Tech in the range of $1,105 million to $1,449 million.  However, the validity of the

fairness opinion is suspect.  First, Degroof Petercam has strong business ties with CMB's

management.  For example, Ludwig Criel, the former chairman of Degroof Petercam's board,

was previously the Chief Financial Officer of CMB and currently serves as a CMB board

member and chairman of CMB's executive committee.  Second, the net asset value of the vessels

owned or to be owned by CMB.Tech was $1,052 million, meaning the acquisition price is at a

9.3% premium to the net asset value, whereas Frontline paid only the net asset value in the Fleet

Sale to Euronav that was completed just one month earlier.  Third, the remaining CMB.Tech

assets, including CMB.Tech's hydrogen business, are hard to value given the uncertain and

speculative nature of their development status.  CMB.Tech is still in the risky startup phase of its development.  CMB offloaded that risk by transferring this venture to Euronav.  While DeGroof Petercam failed to disclose its valuation analysis for the assets, Confidential Informant A (who has deep experience with Euronav's business) does not believe the assets have *any* value for Euronav, let alone enough value to justify a 9.3% premium.

52.     Euronav's acquisition of CMB.Tech is also suspect because CMB has failed many times to capitalize the CMB.Tech business.  According to Kepler Cheuvreux, an independent financial services company focusing on European companies, an attempt to take CMB.Tech public in mid-2022 was canceled due to perceived low investor interest.  According to Confidential Informant A, CMB.Tech was unable to complete an IPO in Norway or the United States, and it failed to raise private equity capital in Belgium, Scandinavia, and the United States.

53.     In its written submission to Euronav in advance of the February 7, 2024 SGM, Plaintiffs requested basic information concerning the CMB.Tech acquisition, including the financial and strategic impact of the transaction, the fairness opinion by Degroof Petercam, and previous failures of CMB.Tech's financing attempts.  Yet again, Euronav failed to substantively address any of those questions and concerns and referred Plaintiffs to the upcoming prospectus from its majority shareholder, CMB.

54.     On February 7, 2024, the acquisition of CMB.Tech was approved by a Euronav shareholder meeting, despite the important unanswered questions concerning this dramatic change to Euronav's strategy and portfolio.  On February 8, 2024, the transaction closed.

55.     The clear inference from these facts is that CMB orchestrated these interconnected transactions to induce Frontline to sell its stake and leave CMB in control of Euronav, while causing Euronav to buy CMB.Tech from CMB and thereby finance CMB's

purchase of Frontline's shares.  The cash price paid to Frontline in the Share Sale, standing

alone, would not have been enough.  CMB seeks to conceal these facts from Euronav's

shareholders and, evidently, from the Belgian regulator, because a truthful accounting would

significantly increase the price CMB would have to pay in the mandatory takeover offer.

**D.      The Share Sale Triggers CMB's Mandatory Takeover Offer for Remaining Euronav Shares**

56.     Article 5 of the Belgian Takeover Code provides that when the 30% ownership

threshold is crossed, the holder must launch a mandatory takeover offer ("MTO") for all of the

company's voting securities or securities conferring access to voting rights.

57.     When the Share Sale was declared unconditional on November 22, 2023, CMB

and its affiliates' beneficial ownership in Euronav was increased to 53.45% and therefore

breached the 30% ownership threshold, triggering the MTO.[1]

58.     Under Belgian Law, the MTO must be launched at the higher of (i) the volume-

weighted average price ("VWAP") over the last 30 days, or (ii) the highest price paid for

Euronav shares over the last 12 months, after accounting for dividends over that period.  At the

time of the Tender Offer, the VWAP was $16.70 and the highest (cash) price paid for Euronav

shares over the last 12 months, after adjusting for dividends, was the $18.43 CMB paid in the

Share Sale.  But that cash price, standing alone, is misleading because CMB paid much more for

its shares through the 3P Transaction, which also included the Fleet Sale and the Settlement

Agreement.

---

[1] It appears that CMB chose to pursue a tender offer for Euronav shares, as opposed to other courses of action such as pursuing a statutory squeeze out of minority shareholders or delisting Euronav shares, in order to avoid an event of default under CMB's financing agreements.

59.    CMB was allowed by the Belgian regulator to deduct a dividend payment of $0.57 per share paid by Euronav on December 20, 2023, reducing the statutory minimum for the MTO from $18.43 to $17.86.

60.    Accordingly, on February 14, 2024, CMB launched the Tender Offer at $17.86 per share.  The offering was commenced in a dual offer structure: (i) the U.S. offer, which is open to all U.S. holders of Euronav's shares and (ii) the Belgium offer, which is open to all holders of Euronav's shares wherever located.

61.    In connection with the commencement of the Tender Offer, CMB made and disseminated the Prospectus and filed with the SEC the other Offering Documents, including a Schedule TO and accompanying documents.  These disclosures were directed at Euronav shareholders in the United States, offering to purchase all outstanding shares of Euronav that are listed on the New York Stock Exchange (as well as Euronext Brussels).

62.    CMB's Tender Offer gives Euronav's shareholders thirty days, until March 15, 2024 (the "Acceptance Period"), to decide whether to tender their shares.

**E.    The Offering Documents Contain Materially False and Misleading Statements**

63.    The Offering Documents contained materially false and misleading statements and omissions, which among other things, led to a depressed offering price for Euronav shares.

64.     The Offering Documents omit material information regarding (i) the true price CMB paid for Frontline's shares in the 3P Transaction, which included not only the cash component but also the Settlement Agreement and Fleet Sale; and (ii) the role the CMB.Tech acquisition played in these transactions, including the clear conflicts of interest that infected the fairness opinion.

65.    Specifically, with respect to the Fleet Sale, the Offering Documents state:

On October 9, 2023, Euronav and Frontline entered into a Framework Agreement, a Heads of Agreement, and corresponding Memoranda of Agreement pursuant to which Euronav agreed to sell 24 very large crude carriers ("**VLCCs**") to Frontline for an aggregate purchase price of approximately $2.35 billion. The Offeror [CMB] was not a party to the [Fleet] Sale agreements.

The purchase price for the [Fleet] Sale was determined on the basis of the average valuations made by three different ship brokers. In the context of the related parties transactions procedure under Belgian law (described below), the committee of independent directors of Euronav appointed an additional ship broker to make its own independent valuation.

66.     While proclaiming that the purchase price was determined on the basis of the average of valuations by three different ship brokers, the Offering Documents failed to include the requisite detail of the brokers' valuation.  The Offering Documents further failed to disclose the fact that although (i) chartering, (ii) financing, (iii) maintenance contracts of the vessels, and (iv) exploitation expectancy are all key components in valuing these types of assets, none of the three valuations even considered these components.  No explanation for such a material omission is provided.

67.     The inadequate account of the Fleet Sale in the Offering Documents also failed to disclose that the Fleet Sale resulted in Frontline more than doubling its fleet, which should have mandated a premium incorporated into the price, on top of the net asset value.  The Fleet Sale also put Euronav at a competitive disadvantage, losing its youngest 24 vessels to Frontline. Confidential Informant A stated that, consistent with the standard practice of the shipping industry, when Euronav purchased vessels in the past, they paid a premium, as Euronav did for the fleet purchased through the CMB.Tech transaction.  The Offering Documents' failure to disclose the omission of any premium to the Fleet Sale price or, at a minimum, an explanation why the parties omitted a premium in contrast to Euronav's past practice, makes the description of the Fleet Sale materially misleading.  The overwhelming inference is that the Fleet Sale was

made at a discount to the price that would be obtained at arm's length, as an inducement for

Frontline to sell its shares to CMB.

68.     The Offering Documents further state, with respect to both the Fleet Sale and

Settlement Agreement:

> The transactions to which Euronav is a party, the [Fleet] Sale and the Settlement
> Agreement, fell within the scope of the related parties transactions procedure set
> out in Article 7:116 of the BCCA. Upon its review of the terms and conditions of
> the transactions, the committee of independent directors of Euronav concluded that,
> in light of the integrated long-term solution to the deadlock within Euronav, the
> [Fleet] Sale and Settlement Agreement are not manifestly unlawful in nature and
> that it is unlikely that the [Fleet] Sale and Settlement Agreement would result in
> disadvantages to Euronav that are not outweighed by benefits to Euronav. The
> committee of independent directors of Euronav therefore advised favorably on the
> proposed [Fleet] Sale and Settlement Agreement.

69.     The Offering Documents do not explain why the Fleet Sale itself was in the best

interests of Euronav and its shareholders when such a sale constituted a stark divergence from its

overall stated strategy to consolidate and acquire oil tankers, not to deconsolidate and sell its

existing fleet.  Specifically, Euronav stated that "[t]he Fleet Sale does not fit within the strategy

most recently communicated by the Company.  On the contrary, the Fleet Sale impedes a

strategy of consolidation in the crude oil market as the Fleet Sale will result in a disposal

(deconsolidation) of the Company's crude oil tankers" and therefore the Fleet Sale was "only

considered in light of the Company's strategic options in light of the prevailing deadlock."  The

failure in the Offering Documents to reveal the rationale for such a stark deviation from

Euronav's overall strategy for the uncertain benefit of ending a "deadlock" with Frontline, as

well as any assessment of the new strategy's effects in comparison with the past business plans,

constituted a material misstatement or omission.

70.     With respect to the Settlement Agreement, the Offering Documents state:

> On October 9, 2023, Euronav, Frontline, Famatown, Hemen Holding Limited and
> Geveran Trading Co. Limited entered into the Settlement Agreement relating to the

17

termination of the arbitration action filed by Euronav on January 28, 2023, following Frontline's termination of the Combination Agreement. The termination of the arbitration was subject to the completion of the Share Purchase. Following the closing of the Share Purchase, the arbitration action was formally terminated on November 22, 2023.

71.     This scant discussion of the release of a highly valuable arbitration claim failed to disclose that Euronav had a "high probability of success" and that an economic expert engaged by the Supervisory Board had deemed the compensatory damages to be "very substantial." According to Confidential Informant A, an economic expert estimated the value of the claim between EUR 500 million and EUR 600 million. If this amount had been properly incorporated into the value that Frontline received for its Euronav shares, Euronav shareholders would have been entitled to an additional $2.46 - $2.96 per share. This is a significant amount that any reasonable investor would consider material in assessing the reasonableness and fairness of the Tender Offer price.

72.     The 3P Transaction and the purchase of CMB.Tech were orchestrated to benefit CMB and Frontline at the expense of Euronav's minority shareholders' interest, and to persuade Frontline to sell its stake to CMB. The Offering Documents therefore fail to give a truthful justification for (i) the voluntary dismissal of the arbitration claim valued up to EUR 600 million with zero compensation, (ii) the sale of Euronav's fleet to its competitor Frontline at a financial and competitive disadvantage, and (iii) Euronav's purchase of CMB.Tech from CMB at an inflated price.

73.     The above-referenced material misstatements and omissions, if corrected, would significantly alter the total mix of information available to Euronav shareholders. Accordingly, FourWorld seeks injunctive and declaratory relief to prevent the irreparable injury that FourWorld will suffer if it is required to decide whether or not to tender its shares without the above-referenced material misstatements and omissions being remedied.

## CAUSE OF ACTION

### FIRST CAUSE OF ACTION
**(Violation of Section 14(e) of the Exchange Act)**

74.     Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

75.     Section 14(e) of the Exchange Act provides that it is

> unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request or invitation.

15 U.S.C. § 78n(e).

76.     Euronav's shares are traded in the United States and listed on the New York Stock Exchange.

77.     CMB violated Section 14(e) of the Exchange Act by disseminating the Offering Documents to Euronav shareholders, which CMB knew or recklessly disregarded contained material omissions and misstatements.

78.     Specifically, CMB issued the Offering Documents in which it made untrue statements of material fact or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading. As discussed above, the Offering Documents falsely represent that the cash price paid to Frontline in the Share Sale was the only valuable consideration for its shares, while omitting significant value from the other pieces of the 3P Transaction. The Offering Documents also

conceal the role that the CMB.Tech acquisition played in these interconnected deals as well as the clear conflict of interest it represents.

79.      CMB knew or recklessly disregarded that the Offering Documents failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

80.      CMB's false and misleading disclosures in the Offering Documents and in its other statements made in connection with the Tender Offer are material because a reasonable shareholder of Euronav would consider them significant in deciding whether to tender their shares.  In addition, a reasonable investor of Euronav would view the information identified above which has been omitted from the offering material as altering the total mix of information made available to shareholders.

81.      CMB knowingly or recklessly made misrepresentations of material fact and omitted the material information identified above from the Offering Documents, causing certain statements therein to be materially incomplete and therefore misleading.  While CMB knew and had access to all the omitted material information in connection with the 3P Transaction and CMB.Tech acquisition, CMB concealed it or at least allowed it to be omitted from the Offering Documents, rendering certain important parts of the Tender Offer statements materially incomplete and misleading.

82.      As the material facts at issue relate to the value of the shares and conflicts of interest, a reasonable shareholder such as FourWorld would consider such information material in deciding whether to tender its shares.

83.      If such materially false and misleading misrepresentations and omissions are not corrected, FourWorld will be deprived of its right to make a fully informed decision and will be

forced to respond to the Tender Offer in the short amount of time before the Acceptance Period closes.  Also, because the Tender Offer may result in a smaller, less liquid and more volatile market for the remaining shareholders, FourWorld is under immense pressure to tender its shares at this time.

84.     As a result of the foregoing, FourWorld seeks an order requiring CMB to make full and accurate disclosures regarding the 3P Transaction so that Euronav shareholders can make an informed decision as to whether to tender their shares.

85.     In addition, FourWorld seeks an order requiring CMB to provide expedited discovery related to the materially false and misleading statements and omissions discussed herein to ensure that CMB's corrective disclosures are complete, accurate, and credible.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against CMB as follows:

a)     declaring that the Offering Documents are materially false and misleading and therefore violate Section 14(e) of the Exchange Act;

b)     declaring that the other statements made by CMB to Euronav shareholders in connection with the Tender Offer, as specifically identified herein, are materially false and misleading and therefore violate Section 14(e) of the Exchange Act;

c)     declaring the Offering Documents null and void due to the above-describe false and misleading statements;

d)     restraining CMB from completing the Tender Offer on the basis of the materially false and misleading Offering Documents and ordering CMB to take all necessary steps to prevent the Tender Offer period from expiring;

e)      ordering expedited discovery related to the material facts concerning the Tender

        Offer and the underlying transactions referenced herein;

f)      awarding Plaintiffs compensatory and punitive damages, as well as Court costs

        and reasonable attorney's fees; and

g)      granting such other relief as the Court deems just and proper.


Dated: New York, New York
       February 26, 2024
                                        Respectfully submitted,


                                        By:    /s/ Joshua M. Slocum
                                               David H. Wollmuth
                                               Joshua M. Slocum
                                               Fletcher W. Strong
                                               Nicole M. Clark
                                               Yating Wang

                                        WOLLMUTH MAHER & DEUTSCH LLP
                                        500 Fifth Avenue
                                        New York, New York 10110
                                        Phone: (212) 382-3300
                                        Fax: (212) 382-0050

                                        *Counsel for Plaintiffs*