UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BOOTHBAY ABSOLUTE RETURN
STRATEGIES, LP, BOOTHBAY
DIVERSIFIED ALPHA MASTER FUND, LP,
CORBIN HEDGED EQUITY FUND, L.P.,
CORBIN ERISA OPPORTUNITY FUND,
LTD., PINEHURST PARTNERS, L.P., FW
DEEP VALUE OPPORTUNITIES FUND I,
LLC, FOURWORLD GLOBAL
OPPORTUNITIES FUND, LTD. and
FOURWORLD EVENT OPPORTUNITIES,
LP,

                              Plaintiffs,

                  -against-

BELGISCHE
SCHEEPVAARTMAATSCHAPPIJ-
COMPAGNIE MARITIME BELGE SA,

                              Defendant.

24-CV-1445 (JGLC)

**OPINION AND ORDER**

---

JESSICA G. L. CLARKE, United States District Judge:

Plaintiffs Boothbay Absolute Return Strategies, LP ("BBARS"), Boothbay Diversified

Alpha Master Fund, LP ("BDA"), Corbin Hedged Equity Fund, L.P. ("CHEF"), Corbin ERISA

Opportunity Fund, Ltd. ("CEOF"), Pinehurst Partners, L.P. ("Pinehurst"), FW Deep Value

Opportunities Fund I, LLC ("FWDV"), FourWorld Global Opportunities Fund, Ltd. ("FWGO")

and FourWorld Event Opportunities, LP ("FWEO," and collectively with BBARS, BDA, CHEF,

CEOF, Pinehurst, FWDV and FWGO, "FourWorld" or "Plaintiffs") bring this action against

Belgische Scheepvaartmaatschappij-Compagnie Maritime Belge SA ("CMB" or "Defendant")

alleging a violation of Section 14(e) of the Securities Exchange Act of 1934 (the "Exchange

Act"). Pending before the Court is Plaintiffs' motion for a preliminary injunction seeking to

enjoin CMB from completing the tender offer scheduled to expire on March 15, 2024 (the

"Tender Offer") due to what Plaintiffs characterize as materially false and misleading statements and omissions in CMB's offering documents. ECF No. 26. For the reasons stated herein, Plaintiffs' motion is DENIED. Defendant's motions to seal are GRANTED in part and DENIED in part.

## FINDINGS OF FACT

The findings of fact below are for purposes of the preliminary injunction motion only and do not subsequently bind the Court. *See New York by James v. Rescue*, No. 23-CV-4832 (KMK), 2023 WL 8472727, at *1 n.2 (S.D.N.Y. Dec. 7, 2023).

### A. Relevant Entities

Non-party Euronav NV ("Euronav") is a publicly traded shipping company with shares listed on the New York Stock Exchange and Euronext Brussels. Ex. B at 4.[1] Plaintiffs are investment funds, managed by FourWorld Capital Management, LLC, and are shareholders of Euronav. ECF No. 1 ("Compl.") ¶¶ 7–14. Defendant CMB represents that Plaintiffs collectively own approximately 2% of Euronav's shares. ECF No. 40 ¶ 4. Non-parties Frontline plc and Famatown Finance Limited (jointly, "Frontline") are former shareholders of Euronav that, before selling their shares to CMB in November 2023 (the "Share Sale"), controlled voting rights of around 25%, which under Belgian law gave Frontline a "blocking minority" on certain structural decisions. Ex. B at 5; Ex. C at 4. CMB is a public limited liability company organized under Belgian law. Ex. A at 3; Ex. B at 24. Before the Share Sale, CMB and its affiliate also had a blocking minority of around 25% of Euronav's voting rights. *Id*. As of February 13, 2024, CMB owned 107,905,344 shares (49.04%) of Euronav individually and 125,720,460 (57.14%) jointly

---

[1] Exhibits are located at ECF Nos. 27, 29, 38–39, 46 and 49.

with its affiliates. Ex. B at 29. Non-party CMB.Tech NV ("CMB.Tech") is a public limited

liability company organized under Belgian law. *Id*. at 15.

**B. Failed Merger and Arbitration Between Euronav and Frontline**

On April 7, 2022, Euronav and Frontline announced plans to merge the companies to

create an entity under the name of Frontline. Ex. I. The merger was to be effectuated by a stock-

for-stock combination pursuant to which Frontline would acquire all of Euronav's shares in exchange

for Frontline shares. Ex. I. On July 12, 2022, CMB, which, like Frontline, held a blocking

minority position in Euronav, publicly announced that it would not support the proposed merger

between Euronav and Frontline due to its views on the medium- to long-term strategy that

Euronav should pursue. Ex. C at 1; Ex. A at 37. On January 9, 2023, Frontline announced that it

had unilaterally terminated the merger. Ex. A at 38. On January 28, 2023, Euronav filed an

arbitration (the "Arbitration") against Frontline for breach of the merger agreement. Ex. K at 1.

**C. The 3P Transaction**

Following the failed merger, Euronav underwent a change in management in March 2023

in which Euronav's supervisory board (the "Supervisory Board" of "Board") was extended from

five to seven members and four new board members were voted in, two of which were affiliated

with CMB and two of which were affiliated with Frontline. Ex. L at 1–2. The Supervisory Board

also included an independent committee (the "Independent Committee" or "IC") during this

period. Ex. C at 1. The newly constituted Board clashed over competing visions for Euronav's

future. *Id*. In July 2023, Euronav's Supervisory Board suspended the Arbitration. *Id*. at 11. In fall

2023, Euronav, Frontline and CMB agreed on a three-part resolution (the "3P Transaction"),

including: (1) Euronav's fleet sale to Frontline (the "Fleet Sale"); (2) an agreement to settle the

Arbitration (the "Arbitration Settlement"); and (3) Frontline's share sale to CMB (the "Share

Sale"). *Id*. at 1; Ex. D. at 1.

In the Fleet Sale, a subsidiary of Frontline purchased crude oil tankers from Euronav for $2.35 billion in cash. Ex. C at 6–7, 12. The Independent Committee obtained an independent vessel valuation from a broker and retained its own financial advisor (Lazard BV/SRL or "Lazard") to assist with the valuation analysis. *Id*. at 2, 9. The IC determined that the Fleet Sale did not fit within Euronav's strategy at the time of consolidation in the crude oil transportation market. *Id*. at 12–13. However, the IC favorably advised the Board on the fleet sale, *id*. at 16, which was approved by 97% of shareholder votes cast at the November 2023 shareholder meeting. *See* Ex. KK.

The IC also favorably advised the Board on the Arbitration Settlement. Ex. C at 16. The IC retained economic advisors (FTI Financial) and legal counsel (Omega Law) to assess the value of Euronav's claim in the Arbitration. Ex. Y at 4–5; Ex. S. The IC reported that it had been advised that Euronav had "high chances of success" in the Arbitration and that the amount of potential compensatory damages had been "quantified" and "would be very substantial." Ex. C at 10–11. Ultimately, the IC favorably advised the Board on the Arbitration Settlement, as part of "an integrated solution with the Fleet Sale and the Share Sale," with no separate compensation for settlement of the Arbitration. *Id*. at 10, 16.

Pursuant to a share purchase agreement dated October 9, 2023, CMB acquired all Euronav shares controlled by Frontline for $18.43 per share in cash. Ex. B at 5. The Share Sale closed on November 22, 2023 and resulted in CMB owning 49.05% of share capital representing 53% of voting rights in Euronav, which triggered a mandatory tender offer ("MTO") under Belgian law. Ex. D at 1; Ex. C at 8–9.

### D.  CMB.Tech Transaction

After the 3P Transaction, but before the Tender Offer commenced, Euronav acquired CMB.Tech from CMB for approximately $1.15 billion in cash (the "CMB.Tech Transaction"). Ex. A at 30. Because CMB stood on both sides of the transaction, as the seller of CMB.Tech and the controlling shareholder of Euronav, the IC obtained a fairness opinion regarding this transaction from DeGroof Petercam Corporate Finance NV ("Degroof"), a Belgian investment banking firm. *See* Ex U at 2; Ex. Q (the "Degroof Fairness Opinion"). Euronav shareholders approved the CMB.Tech transaction at a shareholders meeting on February 7, 2024, with the affirmative vote of 99% of shares voted, and the transaction closed on February 8, 2024. See Ex. NN at 11; ECF No. 29 at 15; ECF No. 41 at 10.

### E.  Mandatory Tender Offers

Because CMB acquired more than 30% of Euronav securities with voting rights in the 3P Transaction, Ex. B at 5, CMB is required to conduct a mandatory tender offer for all shares in Euronav not already owned by CMB or its affiliates. *See* Ex. D at 1. On February 14, 2024, CMB commenced a tender offer in the United States by filing a Schedule TO with the SEC ("Schedule TO") containing 15 pages of disclosures describing the background, negotiation and purpose of the 3P Transaction as well as its future plans for Euronav and the parallel tender offer in Belgium. Ex. A at 37–51. CMB also issued a prospectus in conjunction with its tender offer. Ex. B (the "Tender Offer Prospectus," together with the Schedule TO, the "Offering Documents"). The tender offer price of $17.86 is the same in both the United States and Belgium. Ex. A at 5. Pursuant to Belgian law, the price was set based on the highest price paid for Euronav shares in the 12 preceding months, which was the $18.43 CMB paid in the Share Sale. *Id*. Deducting a dividend payment of $0.57 per share paid by Euronav on December 20,

2023 reduced the MTO price from $18.43 to $17.86 per share. *Id*. CMB's Tender Offer gives

Euronav's shareholders 30 days, from February 14, 2024 until March 15, 2024 (the "Acceptance

Period"), to decide whether to tender their shares. *Id*. at 2.

### F. Commencement of This Litigation

On February 26, 2024, twelve days into the Acceptance Period, Plaintiffs instituted this

action alleging that CMB violated Section 14(e) of the Exchange Act based on materially false

and misleading statements and omissions in CMB's Offering Documents. ECF No. 1. On

February 27, 2024, Plaintiffs filed a motion seeking expedited discovery to support its then-

forthcoming motion for a preliminary injunction. ECF No. 6. On February 29, 2024, the parties

appeared before the Court for a conference to discuss expedited discovery and Plaintiffs'

impending motion. During the conference, the parties agreed that an evidentiary hearing was

unnecessary. On March 1, 2024, the Court entered a scheduling order setting forth the parties'

stipulated schedule for expedited discovery and preliminary injunction briefing and setting an

oral argument on the motion for March 13, 2024. ECF No. 21.

### G. CMB and Euronav's Supplemental Disclosures

As previewed at the February 29, 2024 conference, CMB and Euronav, in response to this

litigation, issued supplemental disclosures on March 1, 2024. CMB added 4 pages of disclosures

to its Schedule TO and Euronav directed its shareholders via Form 6-K to sections on its website

where additional underlying materials are publicly accessible. Ex. Y; Ex. JJ. The disclosed and

publicly available materials include full and unredacted versions of (1) the discussion materials

prepared by Lazard for the IC with respect to the Fleet Sale; (2) a memorandum from Omega

Law regarding the value of Euronav's claim in the Arbitration; and (3) the Degroof Fairness

Opinion regarding the CMB.Tech Transaction. *See* Ex. JJ; Ex. Q; Ex. S; Ex. Y.

### H.  Plaintiffs' Motion for a Preliminary Injunction

On March 3, 2024, Plaintiffs filed their motion for a preliminary injunction seeking to enjoin CMB from completing the Tender Offer, scheduled to expire on March 15, 2024, due to alleged materially false and misleading statements and omissions in CMB's offering documents. ECF No. 26. Plaintiffs allege they will suffer irreparable harm if they must decide whether to tender their shares of Euronav stock "without the complete and accurate information they are owed." ECF No. 29 ("Mot." at 17).

In their motion, Plaintiffs argue that CMB and Euronav's latest disclosures have not mooted this action because the disclosures remain deficient with respect to (1) the details of the likelihood of success and quantification of potential recovery in the Arbitration and (2) the absence of a premium to the net asset value (the "NAV Premium") in the Fleet Sale, which Plaintiffs claim is an industry standard. *Id*. at 2. In sum, Plaintiffs argue that these omissions obscure the truth that the price CMB paid Frontline in the Share Sale was artificially deflated by the other components of the 3P Transaction, specifically because: (1) Euronav furnished Frontline with non-cash consideration in the form of the release of valuable claims in the Arbitration; and (2) Euronav purchased ships from Frontline in the Fleet Sale without the NAV Premium (although Plaintiffs appear to abandon this argument in reply). *Id*. Accordingly, Plaintiffs argue the Tender Offer price of $17.86 per share, which stems from the "artificially deflate[d]" price CMB paid in the Share Sale, should be at least $2.25 higher per share. *Id*. at 2, 13. Plaintiffs say CMB then leveraged its control over Euronav to push through the CMB.Tech Transaction despite the bad economics of the deal for Euronav. ECF No. 48 ("Rep.") at 1, 6. However, Plaintiffs do not argue that the CMB.Tech Transaction affected the Tender Offer price.

CMB opposes Plaintiffs' motion on the basis that Plaintiffs have not demonstrated irreparable harm or a likelihood of success on the merits, including due to mootness, and because the balance of equities favors CMB. ECF No. 41 ("Opp.") at 1–3. In conjunction with its opposition, CMB seeks leave to file certain materials under seal. ECF Nos. 32, 36, 43, 47.

On February 29, 2024, Plaintiffs filed a parallel action in Belgium, challenging the Tender Offer price. ECF No. 22. On March 5, 2024, this Court denied CMB's motion seeking to prohibit Plaintiffs from using discovery obtained in this action in that litigation. ECF No. 31. Plaintiffs sought emergency relief in that case. At oral argument, the parties represented that, on the morning of March 13, 2024, the Belgian Court denied emergency relief enjoining the Tender Offer.

## CONCLUSIONS OF LAW

The Court first addresses Plaintiffs' motion for a preliminary injunction then turns to Defendant's motions to seal. For the reasons stated below, Plaintiffs' motion is DENIED and Defendant's motions to seal are GRANTED in part and DENIED in part.

## I.      Motion for Preliminary Injunction

Preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (internal quotation marks and citation omitted). "To obtain a preliminary injunction, the moving party must demonstrate (1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an injunction." *Red Earth LLC v. U.S.*, 657 F.3d 138, 143 (2d Cir. 2011)

(internal quotation marks and citation omitted). "When considering a motion for a preliminary injunction, unlike a motion to dismiss, the Court need not accept as true the well-pleaded allegations in Plaintiff's complaint." *Coney Island Prep v. United States Dep't of Health & Hum. Servs.*, 506 F. Supp. 3d 203, 209 (S.D.N.Y. 2020) (cleaned up).

### A.  Irreparable Harm

In this Circuit, "[a] showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks omitted). "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *See Grand River Enterprise Six Nations Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks and citations omitted). The injury must be one that "cannot be remedied by an award of monetary damages." *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020) (internal citation omitted).

Plaintiffs argue they will suffer irreparable harm if they have to decide whether to tender their shares "without the complete and accurate information they are owed." Mot. at 17. This argument fails for several reasons.

First, "[i]n order to establish irreparable harm in the context of a tender offer, Plaintiff must point to one or more unravelable or otherwise irreparable harms that will result if the instant Exchange Offer is not enjoined . . . ." *Gold Fields Ltd. v. Harmony Gold Mining Co.*, No. 04-CV-8767 (RMB), 2004 WL 2710030, at *4 (S.D.N.Y. Nov. 23, 2004) (rejecting argument that "virtually any tender offer involving allegedly misleading disclosure(s) results in irreparable

harm") (internal quotation marks omitted). Plaintiffs do not dispute that all the parts of the 3P Transaction have closed and that CMB is already the controlling shareholder of Euronav. CMB and the relevant parties and non-parties will survive the Tender Offer as separate entities. Plaintiffs have not shown that anything needs to be unraveled to afford them relief. *See id.* at *5 (no irreparable harm where companies will survive tender offer as separate entities); *see also Iavarone v. Raymond Keyes Assocs., Inc.*, 733 F. Supp. 727, 731 (S.D.N.Y. 1990) ("[W]hen the corporate entity will survive the proposed transaction, and will not disappear through a merger or otherwise and thereby become immune to liability, courts should refrain from entering injunctive relief."). The Court is not persuaded that "unscrambl[ing] the eggs" – that is, restoration to the pre-transaction status quo – is "necessary to remedy any harm if Plaintiff succeeds on its claims." *Solus Alternative Asset Mgmt. LP v. GSO Cap. Partners L.P.*, No. 18-CV-232 (LTS), 2018 WL 620490, at *5–6 (S.D.N.Y. Jan. 29, 2018) (finding no irreparable harm in allowing tender offer to proceed where "the impact of the challenged [] transaction is essentially economic . . . rather than one affecting corporate control, ownership or governance").

Plaintiffs' observation that the Tender Offer *may* result in CMB gaining greater control over Euronav, Rep. at 2–4, does not distinguish this case from other tender offer cases where there was no irreparable harm. Such a result is typical of the tender offer, which is a vehicle for corporate takeover. *See E.ON AG v. Acciona, S.A.*, 468 F. Supp. 2d 559, 581 (S.D.N.Y. 2007). This is not akin to proxy context where monetary damages do not apply, *see, e.g.*, *Greenlight Cap., L.P. v. Apple, Inc.*, No. 13-CV-900 (RJS), 2013 WL 646547, at *8–9 (S.D.N.Y. Feb. 22, 2013), or a case where a plaintiff is the target company subject to takeover. *See Schmidt v. Enertec Corp.*, 598 F. Supp. 1528, 1541–43 (S.D.N.Y. 1984) (finding tender offer posed no irreparable harm and distinguishing case where the moving party was the plaintiff target

company). "[W]hile it is true that tender offers cannot easily be undone," any harm to Plaintiffs

that flows from permitting the Tender Offer here to proceed "would result in money damages

only." *KDH Consulting Grp. LLC v. Iterative Cap. Mgmt. L.P.*, No. 20-CV-3274 (VM), 2020

WL 2554382, at *7 (S.D.N.Y. May 20, 2020). Thus, "unscrambling" is not necessary to remedy

any harms Plaintiffs may suffer if the Tender Offer moves forward. *Id*. This is particularly true

here where CMB has already publicly committed to reopen the bid to allow U.S. shareholders

the opportunity to tender their shares at the higher prices in the event that the Belgian court

orders CMB to increase the tender price. Opp. at 1, 16; Ex. OO. Although Plaintiffs say such

relief is "comparing apples to oranges" because this is a disclosure action, Rep. at 3, the upshot

of Plaintiffs' allegations ultimately boil down to price. Plaintiffs allege that consideration of the

materials CMB failed to disclose requires that the Tender Offer price be increased by $2.25 or

$3.01 per share, and indeed, Plaintiffs seek compensatory damages in this case. *See* Mot. at 13

n.4; Compl. at 22. CMB compares apples to apples.

Second, contrary to Plaintiffs' suggestion, *see* Mot. at 18, the Court is not convinced that

the mere occurrence of an uninformed vote itself amounts to irreparable harm if the Court need

not confront "the difficulties inherent in unwinding large corporate transactions" to make whole

Plaintiffs' alleged injury. *Silberstein v. Aetna*, *Inc.*, No. 13-CV-8759 (AJN), 2014 WL 1388790,

at *6 (S.D.N.Y. Apr. 9, 2014) (finding a preliminary injunction unwarranted where "the only

harm that will occur absent a preliminary injunction is the legal harm flowing from an allegedly

uninformed vote"). Plaintiffs' authority for the blanket proposition that "[i]njunctive relief is the

appropriate tool to address misleading disclosures in tender offer materials," Mot. at 17, –

including *Sonesta Int'l Hotels Corp. v. Wellington Assocs.*, 483 F.2d 247, 250 (2d Cir. 1973) –

largely predates the Second Circuit's modern articulation of the preliminary injunction standard

and is not availing here where there is no question regarding Defendant's solvency and no need to unravel a corporate control transaction to make Plaintiffs whole. *See Gold Fields*, 2004 WL 2710030, at *4 (distinguishing cases decided before the modern the preliminary injunction standard and rejecting argument that a tender offer involving allegedly misleading disclosures necessarily results in irreparable harm); *Solus*, 2018 WL 620490, at *5–6 n.1 (same).

Third, Plaintiffs fail to show that monetary damages would not provide an adequate remedy. As in other tender offer cases, "those persons who allegedly sold at an unfairly depressed price have an adequate remedy by way of an action for damages." *Gold Fields*, 2004 WL 2710030, at *5 (quoting *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 60 (1975)); *Iavarone*, 733 F. Supp. at 732 ("[E]quitable relief is not appropriate, as money damages will fully compensate plaintiff if he shows at trial or otherwise that violations of section 14(e) of the Williams Act harmed his ability to make an informed choice with regard to the proposed transaction."). Plaintiffs expressly seek compensatory and punitive damages, *see* Compl. at 22, and appear to offer a simple formula for calculating damages. Mot. at 13 n.4 (seeking "additional $2.25" or "$3.01 per share"). Such damages provide an adequate remedy to repair the harms that Plaintiffs allege. *See Solus*, 2018 WL 620490, at *6 (finding no irreparable harm in allowing tender offer to proceed where "Plaintiff can be compensated with an amount of money consistent with the economic harm suffered"); *KDH Consulting*, 2020 WL 2554382, at *7 (finding no irreparable harm where plaintiff's claimed injury stemming from an allegedly uninformed vote "can be redressed monetarily").

Fourth, Plaintiffs' delay in filing this action and seeking preliminary injunctive relief weighs against finding irreparable harm. "Any [] presumption of irreparable harm is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief."

*Tough Traveler, Ltd. v. Outbound Prod.*, 60 F.3d 964, 968 (2d Cir. 1995). Plaintiffs filed this suit on February 26, 2024, 12 days into the 30-day Tender Offer Acceptance Period, and indicated their intention to seek preliminary injunctive relief on February 27, 2024. ECF Nos. 1, 6. As a result of Plaintiffs' delay, this Order comes just two days before the Tender Offer deadline. While the Court does not deem the delay itself dispositive of Plaintiffs' motion, it does further undercut the claimed urgency of the alleged harm where Plaintiffs have known of the facts underlying their complaint since the beginning of the 30-day Acceptance Period. *See* Mot. at 19; *Gold Fields*, 2004 WL 2710030, at *5 (no irreparable harm where, among other factors, plaintiff "waited two weeks after [defendant] filed its Prospectus and Registration Statement before filing this suit").

Fifth, Plaintiffs' claim appears to be substantially if not entirely moot, which undercuts irreparable harm. As Plaintiffs acknowledge, this is a pure disclosure action. Rep. at 7. While Plaintiffs take issue with aspects of CMB's public disclosures, it is unclear what, if any, further information Plaintiffs believe *they* need, and to which they are entitled, to make an informed decision with respect to the Tender Offer. Plaintiffs have not persuasively explained why the discovery CMB has produced in this action, in conjunction with CMB and Euronav's amended disclosures, does not cure the alleged deficiencies in CMB's prior disclosures *with respect to Plaintiffs*. Plaintiffs' representation at oral argument that they do not have all the facts with respect to communications between CMB and Frontline does not amount to an irreparable injury. Plaintiffs' suggestion that the Court should issue preliminary injunctive relief so that other shareholders can also benefit from the information they gleaned in discovery not only fails to allege an injury to Plaintiffs themselves but rather suggests that any such injury has been cured.

Even in a case without expedited discovery, where Plaintiffs and other shareholders are similarly informed or uninformed, Section 14(e) claims are moot where the tender offeror discloses the dispute to shareholders. *See Taro Pharm. Indus., Ltd. v. Sun Pharm. Indus., Ltd.*, No. 09-CV-8262 (PGG), 2010 WL 2835548, at *9 (S.D.N.Y. July 13, 2010). The shareholders can then decide for themselves how to proceed. *Id.* Here, CMB disclosed this litigation to shareholders in the March 4, 2024 press release. Ex. OO. The Court is not persuaded that Section 14(e) requires CMB to do more. *Taro Pharm. Indus., Ltd.*, 2010 WL 2835548, at *9 (cleaned up) ("Taro's shareholders have been provided with the 'pertinent information' that the Williams Act requires, and it will be up to them to 'decide for themselves' the significance of that information. The Act requires no more. In particular, it does not require that a tender offeror . . . admit to the substantive merits of  [complainant]'s allegations."); *see also Ranger Oil Ltd. v. Petrobank Energy & Res. Ltd.*, No. 00-CV-3139 (SHS), 2000 WL 33115906, at *10 (S.D.N.Y. May 23, 2000) ("The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party. By requiring disclosure of information to the target corporation as well as the Securities and Exchange Commission, Congress intended to do no more than give incumbent management an opportunity to express and explain its position."); *Data Probe Acquisition Corp. v. Datatab, Inc.*, 722 F.2d 1, 5–6 (2d Cir. 1983) ("The disclosure required by [Section 14(e)] is not a rite of confession or exercise in common law pleading. What is required is the disclosure of material objective factual matters."). Plaintiffs' attempt to distinguish *Taro Pharm.* is unavailing because Plaintiffs here also "fail[] to explain what additional disclosures [are] needed" to cure their injury. *See* Rep. at 5 n.5.

Sixth, to the extent Plaintiffs seek to assert irreparable harm on behalf of other shareholders, *see* Mot. at 17, Rep. at 5, 7, 9, this is not a derivative or representative action. Plaintiffs have not demonstrated why injury stemming from an uninformed decision to tender by other shareholders would cause Plaintiffs irreparable harm. Moreover, the Court's denial in substantial part of CMB's motions to seal, *see infra* Section II, also means that the materials submitted in conjunction with the instant motion practice, with the exception of privileged materials, will enter the mix of publicly available information before the Tender Offer expires. Nothing in this Order or the Protective Order (ECF No. 35) prevents Plaintiffs from discussing with other shareholders information from this litigation that is publicly available on the docket.

Thus, Plaintiffs have not demonstrated they will suffer irreparable harm absent preliminary injunctive relief. This suffices to deny the motion for a preliminary injunction. *See Gold Fields*, 2004 WL 2710030, at *5 ("Because Plaintiff has failed to show irreparable harm, the Court need not decide" the other prongs of the preliminary injunction test); *KDH Consulting*, 2020 WL 2554382, at *9 ("Setting aside the merits of [Plaintiff]'s claims, the Court would deny injunctive relief solely on the basis of its holding that [Plaintiff] has not demonstrated irreparable harm."); *Solus*, 2018 WL 620490, at *7 ("In the absence of the requisite showing of irreparable harm, it is unnecessary for the Court to address the parties' additional arguments.").

### B.  Merits and Balance of Equities

The Court briefly addresses why consideration of the merits and the balance of equities also counsel in favor of denying the motion. *See Schmidt*, 598 F. Supp. at 1547  ("The Court merely highlights the weaknesses of plaintiffs' § 14(e) claim to further emphasize the inadvisability of the preliminary injunction plaintiffs seek."). The likelihood that Plaintiffs' claim

is substantially if not entirely moot, as explained above, renders it unlikely that Plaintiffs would succeed or raise serious questions on the merits.

The balance of equities inquiry weighs which party "would suffer most grievously if the preliminary injunction motion were wrongly decided." *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, 922 F. Supp. 2d 435, 444 (S.D.N.Y. 2013), *aff'd*, 764 F.3d 210 (2d Cir. 2014) (internal quotation marks omitted). While Plaintiffs "cannot demonstrate irreparable harm," the Court is inclined to credit CMB's representations that it "would, in fact, be injured by injunctive relief." *KDH Consulting*, 2020 WL 2554382, at *8. Whereas Plaintiffs' claimed injury is readily redressable with monetary damages, enjoining the Tender Offer at the eleventh hour risks disrupting the parallel transaction in Belgium and, at a minimum, creating uncertainty. *See id*.

Because Plaintiffs fail to establish irreparable harm, and because the merits and balance of equities also counsel against preliminary injunctive relief, Plaintiffs' motion is DENIED.

## II.    Motions to Seal

The Court now turns to the motions to seal. "The common law right of public access to judicial documents is firmly rooted in our nation's history." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). "The presumption of access is based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice." *Id*. (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)) ("*Amodeo II*"). "[M]otions to seal documents must be 'carefully and skeptically reviewed . . . to ensure that there really is an extraordinary circumstance or compelling need' to seal the documents from public inspection." *Bernsten v. O'Reilly*, 307 F. Supp. 3d 161, 165 (S.D.N.Y. 2018) (quoting *Video Software Dealers Ass'n v. Orion Pictures*, 21 F.3d 24, 27 (2d Cir. 1994)). "The burden of demonstrating that a document submitted to a court should be sealed

rests on the party seeking such action." *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 826 (2d Cir. 1997).

The Second Circuit has articulated a three-part test for determining whether the common law right of public access attaches. *Lugosch*, 435 F.3d at 119–20 (2d Cir. 2006). First, a court must determine whether the documents at issue are "judicial documents" to which a presumption of access attaches. *Id.* at 119. Second, if the documents are judicial documents, a court must determine the weight of the presumption of access. *Id.* Third, a court must balance "competing considerations" against the weight of the presumption of access. *Id.* at 120.

In addition to the common law right of access, there is also a qualified First Amendment right to access judicial documents. *Id.* at 120. Under the First Amendment "experience and logic" test, the court must consider whether the documents "have historically been open to the press and general public" and whether "public access plays a significant positive role in the functioning of the particular process in question." *Id.* (quoting *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 92 (2d Cir. 2004)). If a First Amendment right of access applies, documents may only be sealed "if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* (quoting *In re New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987)).

"Documents and materials provided to aid in the adjudication of a motion for a temporary restraining order or preliminary injunction are judicial documents entitled to the highest presumption of access." *De Kafati v. Kafati Kafati*, No. 22-CV-9906 (VSB), 2022 WL 17552457, at *1 (S.D.N.Y. Dec. 9, 2022). Accordingly, all the materials CMB seeks to seal are judicial documents entitled to the highest presumption of access.

The Court must balance "competing considerations" against the weight of the presumption of access. *Lugosch*, 435 F.3d at 120. Established "competing considerations" include "the danger of impairing law enforcement or judicial efficiency" and "the privacy interests of those resisting disclosure" and of third parties. *Id.*; *see also Amodeo II*, 71 F.3d at 1050–51. In addition, "[f]inancial records of a wholly owned business, family affairs, illnesses, embarrassing conduct with no public ramifications, and similar matters will weigh more heavily against access than conduct affecting a substantial portion of the public." *Amodeo II*, 71 F.3d at 1051. Courts should also consider the "nature and degree of injury" that may result from disclosure, the "reliability of the information" and "whether the nature of the materials is such that there is a fair opportunity for the subject to respond to any accusations contained therein." *Id.* "If such factors outweigh the value to the public of accessing the document at issue, then that document should be sealed." *Matter of Upper Brook Cos.*, No. 22-MC-97 (PKC), 2023 WL 172003, at *1 (S.D.N.Y. Jan. 12, 2023). Parties "opposing disclosure [of a judicial document] must make a particular and specific demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection." *In re Parmalat Sec. Litig.*, 258 F.R.D. 236, 244 (S.D.N.Y. 2009). "[B]road allegations of harm unsubstantiated by specific examples or articulated reasoning fail to satisfy the test." *Id.*

"[D]etailed financial information concerning a privately held business, not previously disclosed to the public, will in most cases warrant confidential treatment." *Closed Joint Stock Co. "CTC Network," v. Actava TV, Inc.*, No. 15-CV-8681 (GBD) (BCM), 2016 WL 1364942, at *3 (S.D.N.Y. Mar. 28, 2016). This is particularly true where revelation of "specific business information and strategies . . . may provide valuable insights into a company's current business practices that a competitor would seek to exploit." *Louis Vuitton Malletier S.A. v. Sunny Merch.*

*Corp.*, 97 F. Supp. 3d 485, 511 (S.D.N.Y. 2015) (internal quotation marks omitted). With respect to "information constituting attorney work product and information subject to the attorney-client privilege, 'it is well-settled in the Second Circuit that the attorney-client privilege may be a sufficiently compelling reason to defeat the public's right of access to judicial documents.'" *Skyline Steel, LLC v. PilePro, LLC*, No. 13-CV-8171 (JMF), 2015 WL 3739276, at *7 (S.D.N.Y. June 15, 2015) (internal quotation marks omitted); *see also Moshell v. Sasol Ltd.*, No. 20-CV-1008 (JPC), 2021 WL 1062015, at *1 (S.D.N.Y. Feb. 16, 2021).

Applying the foregoing standards, the Court finds with respect to Exhibits O, FF, SS and TT that Euronav's interest in maintaining the confidentiality of privileged materials outweighs the presumption of public access to those documents.[2]

With respect to Exhibits N, R, T, V, W, BB, EE, and UU, which comprise minutes of Euronav's Supervisory Board, and Exhibit RR[3] (Lazard Report), the privacy rights of Euronav and its affiliate CMB.Tech do not outweigh the presumption of public access for several reasons.

First, unlike typical cases involving "the privacy interests of innocent third parties," Euronav and CMB.Tech are closely affiliated with CMB, which diminishes the weight of their privacy interests here. *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14-MC-2542 (VSB), 2023 WL 196134, at *4 (S.D.N.Y. Jan. 17, 2023) (citing *Olson v. Major League Baseball*, 29 F.4th 59, 91 (2d Cir. 2022) (finding that because "not all third-party interests have equal weight" and "an entity's third-party status should be placed in context," the

---

[2] CMB did not file a motion to seal with respect to Exhibits RR, SS, TT, UU and VV. The Court heard from the parties with respect to these exhibits at oral argument on March 13, 2024. Plaintiffs confirmed that Exhibit VV was inadvertently filed under seal.

[3] Defense counsel represented at oral argument that CMB does not claim privilege with respect to Exhibit RR.

privacy interest at issue "was not comparable to that of a third party with no association with a named defendant.")).

Second, Euronav is a public company, rather than a privately held business, which reduces the weight of its privacy interests. *See Closed Joint Stock Co.*, 2016 WL 1364942, at *4.

Third, "[c]onfidentiality agreements alone are not an adequate basis for sealing." *Rouviere v. Howmedica Osteonics Corp.*, 645 F. Supp. 3d 157, 163 n.3 (S.D.N.Y. 2022). The Court understands from defense counsel's representation at oral argument that CMB seeks to seal these exhibits due to a non-disclosure agreement with Euronav. However, CMB and Euronav's agreement does not overcome the presumption of public access now that the materials are judicial documents. *Id*.

Fourth, CMB has not demonstrated why the materials in question are particularly commercially sensitive or how their disclosure would cause serious injury.

Fifth, disposition of Plaintiffs' motion based on mootness turns in part on the materials CMB seeks to seal. Access to such documents is necessary "to the public's ability to understand that disposition." *In re Telegraph Media Grp. Ltd.*, No. 23-MC-215 (JGLC), 2023 WL 5770115, at *5 (S.D.N.Y. Sept. 6, 2023).

Thus, CMB's motion to seal is GRANTED with respect to Exhibits O, FF, SS and TT and DENIED in all other respects. This determination extends to all portions of documents, including memoranda of law and proposed findings of fact and conclusions of law, which incorporate redactions based on the motions to seal. "Because the common law framework is dispositive of the motion[s] to seal, the Court need not undertake the First Amendment analysis." *Telegraph*, 2023 WL 5770115, at *6.

## CONCLUSION

For the reasons set forth above, Plaintiffs' motion for a preliminary injunction is DENIED and Defendant's motions to seal are GRANTED in part and DENIED in part. The parties are ORDERED to publicly file versions of the preliminary injunction materials that conform to Section II of this Order no later than **March 13, 2024**. The parties are directed to meet and confer regarding a proposed case management plan and file a joint letter pursuant to Individual Rule 3(c) no later than **March 27, 2024**.

The Clerk of Court is directed to terminate ECF Nos. 26, 28, 43 and 47.


Dated: March 13, 2024
       New York, New York

                                        SO ORDERED.

                                        JESSICA G. L. CLARKE
                                        United States District Judge