UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BOOTHBAY ABSOLUTE RETURN STRATEGIES, LP,
BOOTHBAY DIVERSIFIED ALPHA MASTER FUND,
LP, CORBIN HEDGED EQUITY FUND, L.P., CORBIN
ERISA OPPORTUNITY FUND, LTD., PINEHURST
PARTNERS, L.P., FW DEEP VALUE OPPORTUNITIES
FUND I, LLC, FOURWORLD GLOBAL
OPPORTUNITIES FUND, LTD., and FOURWORLD
EVENT OPPORTUNITIES, LP,

     Plaintiffs,

    - against -

BELGISCHE SCHEEPVAARTMAATSCHAPPIJ-
COMPAGNIE MARITIME BELGE SA,

     Defendant.

1:24-cv-1445-JGLC


**ORAL ARGUMENT
REQUESTED**


**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**

# **TABLE OF CONTENTS**

**Page**

Table of Authorities ........................................................................................................ ii

Preliminary Statement ..................................................................................................... 1

Statement of Facts .......................................................................................................... 3

Legal Standard .............................................................................................................. 10

Argument ...................................................................................................................... 11

I.      Plaintiffs' Disclosure Claim is Moot .............................................................. 11

II.     Plaintiffs Fail to State a Viable Section 14(e) Claim ...................................... 15

        A.      Plaintiffs Cannot State a Section 14(e) Claim Based on Pricing ......... 15

        B.      Plaintiffs Fail to Allege a Material Misstatement or Omission ........... 16

        C.      Plaintiffs Fail to Allege Scienter ....................................................... 17

        D.      Plaintiffs Fail to Plead Damages ....................................................... 19

CONCLUSION .............................................................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................................................................................10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................................10

*Boothbay Absolute Return Strategies, LP v. Belgische Scheepvaartmaatschappij-Compagnie Maritime Belge SA*,
No. 24-CV-1445, 2024 WL 1097128 (S.D.N.Y. Mar. 13, 2024) ................................... *passim*

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002)...........................................................................3

*In re Citigroup, Inc. Sec. Litig.*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004).............................................................12

*Consol. Gold Fields, PLC v. Anglo Am. Corp. of S. Afr. Ltd.*,
713 F. Supp. 1457 (S.D.N.Y. 1989)..........................................................11, 15

*Data Probe Acquisition Corp. v. Datatab, Inc.*,
722 F.2d 1 (2d Cir. 1983)........................................................................2, 6, 12

*Diamond v. Arend*,
649 F. Supp. 408 (S.D.N.Y. 1986) .................................................................17

*Halperin v. eBankerUSA.com, Inc.*,
295 F.3d 352 (2d Cir. 2002)..........................................................................16

*ICN Pharms., Inc. v. Khan*,
2 F.3d 484 (2d Cir. 1993)..............................................................................11

*Kennecott Copper Corp. v. Curtiss-Wright Corp.*,
584 F.2d 1195 (2d Cir. 1978).........................................................................16

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005)...........................................................................19

*Lipow v. Net 1 UEPS Techs., Inc.*,
131 F. Supp. 3d 144 (S.D.N.Y. 2015)..........................................................3, 10

*Macfadden Holdings, Inc. v. JB Acquisition Corp.*,
802 F.2d 62 (2d Cir. 1986)............................................................................17

*Makarova v. United States,*
    201 F.3d 110 (2d Cir. 2000) .......................................................................................10

*Nano Dimension Ltd. v. Murchinson Ltd.,*
    No. 23-CV-02566 (JLR), 2023 WL 4422788 (S.D.N.Y. July 10, 2023) .................................11

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
    575 U.S. 175 (2015) .................................................................................................16

*Perrigo Co. PLC v. Mylan N.V.,*
    2015 WL 9916726 (S.D.N.Y. Oct. 29, 2015) .......................................................................16

*In re PHLCORP Sec. Tender Offer Litig.,*
    700 F. Supp. 1265 (S.D.N.Y. 1988) ...............................................................................14, 16

*Polar Int'l Brokerage Corp. v. Reeve,*
    108 F. Supp. 2d 225 (S.D.N.Y. 2000) ...............................................................................17

*Resnik v. Swartz,*
    303 F.3d 147 (2d Cir. 2002) .......................................................................................16

*Iowa Pub. Emp.'s Ret. Sys. v. Deloitte & Touche LLP,*
    919 F. Supp. 2d 321 (S.D.N.Y. 2013) ...........................................................................17, 19

*Schreiber v. Burlington N., Inc.,*
    472 U.S. 1 (1985) .................................................................................................15

*Sodhi v. Gentium S.P.A.,*
    No. 14-CV-287 (JPO), 2015 WL 273724 (S.D.N.Y. Jan. 22, 2015) .......................................17

*Soueidan v. Breeze-E. Corp.,*
    No. 16 Civ 0015 (ER), 2017 WL 627456 (S.D.N.Y. Feb. 15, 2017) ...................................16

*Tabak v. Can. Solar Inc.,*
    549 F. App'x 24 (2d Cir. 2013) .......................................................................................18

*Taro Pharm. Indus., Ltd. v. Sun Pharm. Indus., Ltd.,*
    No. 09 Civ 8262 (PGG), 2010 WL 2835548 (S.D.N.Y. July 13, 2010) ..............11, 12, 15, 16

*Thesling v. Bioenvision, Inc.,*
    374 F. App'x 141 (2d Cir. 2010) .......................................................................................16

*United States v. Sanchez-Gomez,*
    584 U.S. 381 (2018) .................................................................................................10

*Wardrop v. Amway Asia Pac. Ltd.,*
    No. 99 Civ. 12093 DC, 2001 WL 274067 (S.D.N.Y. Mar. 20, 2001) ..............................13, 16

**Statutes**

Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4......................................11, 15, 17, 19

Securities Exchange Act of 1934, Section 14(e) ............................................................... *passim*

**Other Authorities**

Federal Rule of Civil Procedure 9(b)............................................................................................15

Federal Rule of Civil Procedure 12(b)......................................................................................1, 10

Defendant Belgische Scheepvaartmaatschappij-Compagnie Maritime Belge NV ("CMB"), through its undersigned counsel, respectfully submits this memorandum of law, together with the accompanying Declaration of Rebecca L. Martin, dated April 19, 2024 ("Martin Declaration"), with attached exhibits, in support of its motion to dismiss plaintiffs Boothbay Absolute Return Strategies, LP, Boothbay Diversified Alpha Master Fund, LP, Corbin Hedged Equity Fund L.P., Corbin ERISA Opportunity Fund, Ltd., Pinehurst Partners, L.P., FW Deep Value Opportunities Fund I, LLC, FourWorld Global Opportunities Fund, Ltd., and FourWorld Event Opportunities, LP's ("Plaintiffs") complaint (ECF No. 1, the "Complaint" or "Compl.") pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

As this Court previously concluded in denying Plaintiffs' motion for a preliminary injunction, Plaintiffs' disclosure claims under the Williams Act, Section 14(e) of the Securities Exchange Act of 1934 (the "Exchange Act") are "substantially if not entirely moot," *Boothbay Absolute Return Strategies, LP v. Belgische Scheepvaartmaatschappij-Compagnie Maritime Belge SA*, No. 24-CV-1445 (JGLC), 2024 WL 1097128, at *7 (S.D.N.Y. Mar. 13, 2024), and therefore should be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). CMB repeatedly asked Plaintiffs to dismiss this case voluntarily to avoid burdening this Court with further unnecessary motion practice, but Plaintiffs declined without explanation. The purpose of this motion is to bring this case to an end.

This case arises from a mandatory tender offer under Belgian law by CMB for the U.S.-held shares of Euronav NV ("Euronav" or the "Company") which expired on March 15, 2024. Plaintiffs alleged that the $17.86 tender offer price did not reflect the value that CMB supposedly agreed to pay to resolve a shareholder deadlock in the form of (i) a supposedly below-market purchase price of $2.35 billion for the sale of 24 very large crude carriers ("VLCCs") (the "Vessel

1

Sale") that CMB was not a party to, and (ii) the settlement of an arbitration in Belgium for breach of a combination agreement governed by Belgian law (the "Settlement") that CMB also was not a party to. Recognizing that their objection to the tender offer price was not justiciable in the U.S. under the guise of a disclosure claim, Plaintiffs filed a separate lawsuit in Belgium alleging substantially the same facts against CMB and the Belgian national securities regulator, the Financial Services and Markets Authority ("FSMA"), and seeking a higher per share price. Plaintiffs have also since filed another lawsuit in Belgium against CMB, Euronav, and others seeking, among other things, a declaration that that all decisions of Euronav's supervisory board and general meeting in relation to these transactions, as well as the transactions themselves, are null and void. Neither of those cases are this case.

Rather, Plaintiffs' sole claim in this action is a disclosure claim. But at the time Plaintiffs filed their Complaint, all of the material facts were available to Plaintiffs on Euronav's public website, and CMB essentially incorporated that public disclosure into its tender offer documents. As this Court previously observed, "Section 14(e) claims are moot where the tender offeror discloses the dispute to shareholders." *Boothbay*, 2024 WL 1097128, at *6. Euronav's shareholders were able to "decide for themselves how to proceed," fully informed of this dispute and Plaintiffs' allegations. Unable to dispute that all of the relevant transactions were fully disclosed and overwhelmingly approved by Euronav's shareholders, Plaintiffs seek to attach self-serving pejoratives to the transactions and assert that the failure to adopt those characterizations constitutes fraud. But the law is clear that Section 14(e) does not require tender offerors to fall on their swords. *See Data Probe Acquisition Corp. v. Datatab, Inc.*, 722 F.2d 1, 5-6 (2d Cir. 1983) (disclosure required by Section 14(e) is "not a rite of confession").

For all of these reasons, and as set forth more fully below, Plaintiffs' Complaint should be dismissed in its entirety, with prejudice.

## STATEMENT OF FACTS[1]

### A. Parties and Relevant Non-Parties

Plaintiffs are investment funds managed by non-party FourWorld Capital Management, LLC (collectively, "FourWorld") that are or were shareholders of non-party Euronav, a publicly traded shipping company with shares listed on both the New York Stock Exchange and Euronext Brussels. Compl. ¶¶7–14, 17.

Non-parties Frontline plc and Famatown Finance Limited (collectively "Frontline") are former Euronav shareholders that sold their shares to CMB in November 2023. Compl. ¶¶18–19, 35–36.

Defendant CMB is a family-owned business that has been the majority shareholder of Euronav since acquiring Frontline's Euronav shares in November 2023. Compl. ¶¶16, 35–36.

### B. The Structural and Strategic Deadlock Within Euronav

As alleged in the Complaint, CMB and Frontline had "competing visions for Euronav's future" that led to a strategic and structural deadlock within Euronav. Compl. ¶33. In particular, while Frontline envisioned Euronav remaining exclusively focused on shipping crude oil, CMB's "alternative strategic view" for Euronav was "aimed at a diversification into different shipping segments to decrease the dependency on the transportation of crude oil[,]" decarbonization, and

---

[1] These facts derive from the allegations in the Complaint which are assumed to be true solely for purposes of this motion, and the documents relied upon in, or otherwise integral to, the Complaint. *See Lipow v. Net 1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 157–58 (S.D.N.Y. 2015) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002)). Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Complaint attached as Exhibit A to the Declaration of Rebecca L. Martin dated April 19, 2024. Unless otherwise noted, internal citations are omitted, and alterations, ellipses and emphases are added.

deploying capital to develop low carbon engines and fuel supply systems and produce low-carbon fuels. ECF No. 27-3 at 5; Compl. ¶¶40, 42, 47 (referencing the independent committee's report). This "strategic deadlock within the Company" was "reinforced by a structural deadlock resulting from the fact that each [of Frontline and CMB] ha[d] a blocking minority on structural decisions and the existence of various factions within the supervisory board." ECF No. 27-3 at 1.

## C. The Failed Frontline Merger and Subsequent Arbitration

In April 2022, Euronav announced a proposed stock-for-stock combination pursuant to which Frontline would acquire all of Euronav's shares in exchange for Frontline shares. Compl. ¶¶25–26. Believing in its own alternative strategy for Euronav, CMB publicly announced in July 2022 that it would not support the proposed merger with Frontline and, in December 2022, "requested termination of the deal." *Id.* ¶29. In January 2023, Frontline terminated the merger, and Euronav commenced an arbitration against Frontline for breach of the combination agreement. *Id.* ¶¶30–31.

## D. Ending the Deadlock

In the fall of 2023, Euronav, Frontline, and CMB agreed on a three-part resolution of the deadlock, including (1) the Vessel Sale to Frontline; (2) the Settlement of claims arising from the termination of the combination agreement between Frontline and Euronav; and (3) the Share Sale, followed by CMB's mandatory public tender offer under Belgian law for all outstanding Euronav shares triggered by the Share Sale. Compl. ¶34. As Plaintiffs acknowledge in the Complaint, because the Vessel Sale and Settlement involved Frontline, a related party, Euronav was required under Belgian law to have an independent committee review the transactions, which it did. Compl. ¶39. After conducting a thorough review, the Independent Committee issued written reasoned advice recommending the approval of both transactions (the "First IC Advice"), which was published on Euronav's public website in advance of the November 21, 2023 shareholder meeting

where shareholders were to vote on the transactions. *See* ECF No. 27-3; Compl. ¶40 (referencing "[t]he independent committee's report"). While Plaintiffs allege that Euronav's board "refused to provide the annexes to the report of the independent committee, even though they were described as an integral part of the report," Compl. ¶46, those materials (including the full, unredacted discussion materials prepared by the Independent Committee's own financial advisor) have since been disclosed, *e.g.*, ECF Nos. 27-26, 38-5; Euronav, Presentation Materials made by Linklaters LLP (Oct. 4, 2023), https://www.euronav.com/media/67704/linklaters-annex-2.pdf.

Euronav also published on its public website a written record of answers in response to questions submitted by shareholders (including FourWorld) prior to the Special General Meeting of Shareholders on November 21, 2023 ("November Written Q&A"). ECF No. 38-11; *see* Compl. ¶5 (alleging that "FourWorld submitted written questions to Euronav about each of these transactions in advance of the relevant shareholder meeting to consider their approval").

### 1. The Vessel Sale

Under the Vessel Sale, Frontline purchased 24 VLCCs for $2.35 billion in cash. Compl. ¶37. As the Independent Committee explained in the First IC Advice (which is incorporated by reference in the Complaint), these 24 vessels were "valued on the basis of an average of 3 broker valuations, i.e., Arrow [a broker selected by Euronav], VesselsValue [selected by CMB] and Fearnleys [selected by Frontline]." ECF No. 27-3 at 9. The Independent Committee also obtained its own independent vessel valuations from a fourth broker (Braemar) and retained its own financial adviser (Lazard BV/SRL or "Lazard"). *Id.* at 2, 9.

While Plaintiffs allege that CMB's tender offer documents "failed to include the requisite detail of the brokers' valuation[,]" Compl. ¶66, that information has since been disclosed in the Amended Schedule TO (defined below), ECF No. 27-25, pdf p.6 (describing the selection of the vessel valuation firms and the vessel valuations used in the Vessel Sale). Unsurprisingly, Plaintiffs

seemingly abandoned these alleged omissions in connection with their motion for a preliminary injunction. *See* ECF No. 30 at 13–15; ECF No. 45 at 7.[2] While not essential to the resolution of this motion, Euronav has since reported a capital gain of approximately $700 million on the Vessel Sale. *See* ECF No. 38-7, pdf p.5.

### 2. The Settlement

As explained in the First IC Advice (which is incorporated into the Complaint), the Independent Committee determined that "a solution to the deadlock without a Settlement, or with a Settlement against a one-time compensation for Euronav, is not a realistic alternative." ECF No. 27-3 at 14. Euronav retained legal and economic advisers to assist in quantifying the amount of potential compensatory damages to which Euronav could have been entitled assuming that Euronav prevailed in the arbitration and that all conditions under the combination agreement would be fulfilled. *Id.* at 11.

Plaintiffs allege that the First IC Advice "did not disclose the amount [of potential compensatory damages] beyond stating that they were 'very substantial'" and that "an economic expert estimated the value of the claim between EUR 500 million and EUR 600 million." Compl. ¶¶40, 71. This has since been disclosed in Amended Schedule TO (defined below). ECF No. 27-25, pdf p.5 (disclosing that "experts assessed the net present value of the claim ranging between 0 and 600 million Euros….").

---

[2] Plaintiffs also allege that CMB should have disclosed that the Vessel Sale "should have mandated a premium incorporated into the price, on top of the net asset value" and was a "sweetheart deal" arranged "to provide additional value to Frontline" that "should have been included in determining the mandatory tender offer price" (which was set entirely in accordance with Belgian law). Compl. ¶¶3, 67. As discussed below, however, "[t]he disclosure required by [Section 14(e)] is not a rite of confession or exercise in common law pleading. What is required is the disclosure of material objective factual matters." *Datatab*, 722 F.2d at 5–6.

### 3. The Share Sale

Under the Share Sale, CMB acquired all Euronav shares controlled by Frontline for $18.43 per share in cash. Compl. ¶36. The Share Sale closed on November 22, 2023 and resulted in CMB controlling 53% of the voting rights at such time in Euronav, which as discussed below triggered a mandatory tender offer under Belgian law. *Id.*

### E. CMB's Simultaneous Mandatory Tender Offers

Because CMB acquired more than 30% of Euronav shares with voting rights, CMB was required under Belgian law to conduct a mandatory tender offer for all shares in Euronav not already owned by CMB or its affiliates. Compl. ¶¶56–57. CMB's obligation to launch the dual tender offers, as well as the expected price, was fully disclosed to Euronav's shareholders (including FourWorld) as early as October 2023. *See* ECF No. 27-3.

On February 14, 2024, CMB commenced a tender offer in the U.S. by filing a Schedule TO with the SEC ("Schedule TO") containing 16 pages of disclosures describing the background, negotiation, and purpose of the transactions as well as its future plans for Euronav and the parallel tender offer in Belgium. Compl. ¶¶60–61; ECF No. 27-1 at 37-51. The tender offer price in both jurisdictions was the same and was set at $17.86 according to Belgian law and approved by the FSMA. *See* Compl. ¶¶58–60.

### F. The Unrelated CMB.TECH Transaction

After the Share Sale closed, but before the mandatory tender offer commenced, Euronav acquired CMB.TECH from CMB for approximately $1.15 billion in cash. Compl. ¶¶48, 54; ECF No. 27-1 at 30. As Plaintiffs acknowledge in the Complaint, because CMB was "a related party," the transaction was subject to prior review by the Independent Committee, which (as above) issued a written reasoned advice to Euronav's Supervisory Board recommending approval of the CMB.TECH transaction, which was then published on Euronav's public website in advance of the

shareholder meeting on February 7, 2024 (the "Second IC Advice"). ECF No. 27-21; Compl.
¶¶49–50 (alleging that "the independent committee recommended approval of the CMB.Tech
transaction").

The Independent Committee retained its own legal and financial advisers, including
Degroof Petercam Corporate Finance NV ("Degroof"), a prominent Belgian investment banking
firm. Compl. ¶51 (alleging that "[t]he fairness opinion was completed by Degroof Petercam").
Plaintiffs allege in the Complaint that "De[g]roof Petercam failed to disclose its valuation analysis
for the assets," Compl. ¶51, but the entire unredacted report has since been disclosed prior to the
expiration of the tender offer, ECF Nos. 27-21, 27-17; *see also* ECF No. 38-5.[3]

Euronav also published on its public website a written record of answers in response to
questions submitted by shareholders (including FourWorld) prior to the Special General Meeting
of Shareholders on February 7, 2024 ("February Written Q&A"). ECF No. 38-12.

## G.    Plaintiffs File Lawsuits Against CMB Here and in Belgium

On February 26, 2024, nearly two weeks into the 30-day tender offer period, Plaintiffs
commenced this action under Section 14(e) of the Exchange Act. *See* Compl. Plaintiffs alleged
the following specific topics were inadequately disclosed: the valuation of the Vessel Sale; the
rationale and negotiation behind the Vessel Sale and the Settlement; the monetary assessment of
the arbitration claims; the true price CMB paid for Frontline's shares; and the role the CMB.TECH
acquisition played in these transactions. Compl. ¶¶55, 64, 67, 78.

A few days later, Plaintiffs filed a petition in the Market Court in Brussels, Belgium on
February 29, 2024 against CMB and the FSMA (for approving Euronav's prospectus on

---

[3] Plaintiffs also allege that "[t]he Offering Documents fail to explain why Euronav purchased the
CMB.Tech fleet." Compl. ¶4. As explained further below, however, such additional information
is both wholly irrelevant to the tender offer and already publicly available in the Second IC Advice.

February 13, 2024) seeking to increase the Belgian tender offer bid price.  *See* ECF No. 38-10; Compl. ¶¶27–29, 55.

On April 8, 2024, after the tender offer period expired, Plaintiffs also filed another lawsuit against CMB, Euronav, Frontline, and others in the Enterprise Court in Antwerp, Belgium seeking a declaration, among other things, that all decisions of Euronav's supervisory board and general meeting in relation to these transactions, as well as the transactions themselves, are null and void. *See* Euronav, Press Release (Apr. 8, 2024), https://www.sec.gov/Archives/edgar/data/1604481/000091957424002416/s11025052.htm.

## H.    CMB's (and Euronav's) Supplemental Disclosures

While CMB disputes that any additional disclosure was necessary, on March 1, 2024, both CMB and Euronav supplemented their disclosures, with CMB adding another 4 pages of disclosures to the Schedule TO through Amendment No. 2 to Schedule TO (ECF No. 27-25, the "Amended Schedule TO"), and Euronav directing its shareholders via a Form 6-K filed with the SEC to specific sections on its public website where anyone could access additional underlying materials, ECF No. 38-5.

## I.    The Court Denied Plaintiffs' Motion for a Preliminary Injunction

On March 13, 2024, two days before the tender offer period was set to expire, the Court issued an order denying Plaintiffs' motion for a preliminary injunction, finding that Plaintiffs could not demonstrate any of the required elements necessary to obtain such extraordinary and disruptive eleventh-hour relief.  *See Boothbay*, 2024 WL 1097128, at *6–7.  Specifically, the Court outlined six reasons as to why Plaintiffs could not demonstrate irreparable harm, including that Plaintiffs' delay in filing suit and their preliminary injunction motion, as well as the fact that Plaintiffs' claim was mooted by CMB's various public disclosures and could be remedied by monetary damages. *Id.* at *4–7.  The Court also found that Plaintiffs' claim was unlikely to succeed as such claim was

mooted; and that the balance of equities weighed in favor of CMB because Plaintiffs' claimed injury could be redressed with monetary damages such that it was not worth disrupting the parallel transaction in Belgium. *Id.* at *6–7.

**J.      The U.S. and Belgian Tender Offers Expired on March 15, 2024**

Both the U.S. and Belgian tender offers expired on March 15, 2024, and the tender offers closed on April 3, 2024. *See* Euronav, Amendment No. 6 to Schedule TO (Mar. 18, 2024), https://www.sec.gov/Archives/edgar/data/1604481/000119312524070256/d783351dsctota.htm.

**LEGAL STANDARD**

To survive a motion to dismiss, Plaintiffs' Complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. In deciding a motion to dismiss under Rule 12(b)(6), courts "may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, [] matters of which judicial notice may be taken[,] or . . . public disclosure documents that must be filed with the [SEC]". *Lipow*, 131 F. Supp. 3d at 157.

"A case that becomes moot at any point during the proceedings is "no longer a 'Case' or 'Controversy' for purposes of Article III," and is outside the jurisdiction of the federal courts." *United States v. Sanchez-Gomez*, 584 U.S. 381, 385–86 (2018). "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court … may refer to evidence outside the pleadings." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

**ARGUMENT**

## I. PLAINTIFFS' DISCLOSURE CLAIM IS MOOT

Plaintiffs' sole claim under the Williams Act should be dismissed as moot. As this Court recognized at the preliminary injunction stage, Section 14(e) disclosure claims are moot once a corrective disclosure has been made. *Boothbay*, 2024 WL 1097128, at *6 ("Section 14(e) claims are moot where the tender offeror discloses the dispute to shareholders. The shareholders can then decide for themselves how to proceed."); *see also, e.g.*, *Taro Pharm. Indus., Ltd. v. Sun Pharm. Indus., Ltd.*, No. 09 Civ. 8262 (PGG), 2010 WL 2835548, at *10 (S.D.N.Y. July 13, 2010) (explaining that "[i]t has been stated as the general rule that 'once a subsequent 13D filing cures alleged omissions in a prior filing, the § 13(d) claim alleging omissions must be dismissed as moot,'" and "[t]his same logic regarding corrective disclosures applies with equal force in the context of an asserted Section 14(e) violation"); *Consol. Gold Fields, PLC v. Anglo Am. Corp. of S. Afr. Ltd.*, 713 F. Supp. 1457, 1474 (S.D.N.Y. 1989) ("[E]ven if there was a [§ 14(e)] violation, [tender offeror] has cured it."); *see also ICN Pharms., Inc. v. Khan*, 2 F.3d 484, 489 (2d Cir. 1993) (recognizing that corrective disclosure cures alleged violation of the Williams Act); *Nano Dimension Ltd. v. Murchinson Ltd.*, No. 23-CV-02566 (JLR), 2023 WL 4422788, at *10 (S.D.N.Y. July 10, 2023) ("In accordance with the limited purpose of the Williams Act, there is generally no basis for relief under Section 13(d) once the information in question is disclosed.").

CMB's initial Schedule TO already included 16 pages of disclosures describing the background, negotiation, and purpose of the transactions as well as CMB's future plans for Euronav. ECF No. 27-1 at 37-51. While CMB disputes that any additional disclosure was necessary, both CMB and Euronav supplemented their disclosures, with CMB adding another 4 pages of disclosures to the background section and Euronav directing its shareholders to specific

11

websites where anyone can access additional underlying materials requested by FourWorld. ECF Nos. 27-25, 38-5. Plaintiffs' claim is entirely moot.

For example, in the Complaint, Plaintiffs claimed to want additional detail concerning the broker valuations of the 24 vessels that Euronav sold to Frontline and the strategic rationale for the Vessel Sale. Compl. ¶¶46–47, 66–69. That additional information was provided in the Amended Schedule TO, ECF No. 27-25 at 4–7, and in the materials prepared by Lazard for the Independent Committee, ECF No. 27-16 at 12, 20–21, which were posted by Euronav on its public website as disclosed in its Form 6-K, ECF No. 38-5. Additional information concerning the broker valuations was also contained in the First IC Advice and in written responses to investor questions, which were already published on Euronav's public website in connection with the shareholder vote in November 2023. ECF No. 27-3 at 9-10; ECF No. 38-11.

Similarly, Plaintiffs allege that *CMB* should have disclosed that, because *Euronav* did not charge Frontline a premium for the 24 vessels on top of the fair market value determined by four different brokers, the lack of premium should somehow be counted as consideration that *CMB* paid to Frontline in the Share Sale. Compl. ¶3. Even if that were a cognizable legal theory (it is not), "[t]he Williams Act is not designed to force the tender offeror to admit the [complainant]'s underlying allegations," *Taro Pharm.*, 2010 WL 2835548, at *9, or accuse itself of wrongdoing or antisocial or illegal policies, *see In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (noting in Section 10(b) case that "the federal securities laws do not require a company to accuse itself of wrongdoing"), *aff'd sub nom. Albert Fadem Trust v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006); *Datatab*, 722 F.2d at 5–6. "Rather, '[w]here there exists a good faith dispute as to facts or an alleged legal violation, the Williams Act only requires disclosure of the dispute,'" so as to provide shareholders with "pertinent information … so that they can decide

for themselves what they wish to do." *Taro Pharm.*, 2010 WL 2835548, at *9; *Datatab*, 722 F.2d at 5–6 ("The disclosure required by [Section 14(e)] is not a rite of confession or exercise in common law pleading. What is required is the disclosure of material objective factual matters.").

Moreover, as Plaintiffs have known since the First IC Advice was published online last year, the Independent Committee's financial adviser expressly considered the price-to-net asset value ratios of selected precedent transactions, "concluding on an average Price/NAV ratio of 0.9x and a median of 1.0x, which is in line with the ratio applied for the [Vessel] Sale." ECF No. 27-3 at 9–10.[4]

In connection with the Settlement, FourWorld initially sought additional disclosures concerning the availability and magnitude of potential damages in Euronav's arbitration against Frontline as well as the rationale for entering into the Settlement. Compl. ¶¶46–47, 71–72. This too was disclosed in the Amended Schedule TO filed on March 1, 2024, ECF No. 27-25, pdf p. 4, as well as in the Lazard discussion materials and the memorandum of counsel attached to the First IC Advice, both of which have been made publicly available on Euronav's public website as disclosed in Euronav's recent Form 6-K. *See* ECF No. 38-5.

As for the CMB.TECH transaction, Plaintiffs' allegations in the Complaint were once again focused on value and the rationale for the purchase but had absolutely nothing to do with the tender offer price. Compl. ¶¶4, 51. Moreover, that information has been more than adequately disclosed, including by making the full, unredacted Degroof fairness opinion publicly available on Euronav's public website, as disclosed in Euronav's recent Form 6-K. *See* ECF No. 38-5; *Wardrop v. Amway Asia Pac. Ltd.*, No. 99 Civ. 12093 DC, 2001 WL 274067, at *4 (S.D.N.Y. Mar. 20,

---

[4] While not essential to the resolution of this motion, Euronav reported approximately an $700 million capital gain on the Vessel Sale. *See* ECF No. 38-10, pdf p.5.

2001), *aff'd*, 26 F. App'x 89 (2d Cir. 2002) (explaining that "where the information that defendants allegedly failed to disclose was publicly disseminated, … investors did not need to rely on disclosure statutes to ensure that they were fully informed").[5]  The rationale for the transaction was also disclosed to Euronav shareholders in the Second IC Advice, *see* ECF No. 27-21 at 3, which was available on the very same website, as well as in several other publicly available documents.  *See* ECF No. 38-5; Euronav, Capital Markets Day Presentation (Jan. 12, 2024), https://www.sec.gov/Archives/edgar/data/1604481/000119312524007629/d616932dex991.htm. Specifically, the Independent Committee determined that "[t]he Transaction fits into the aims of diversifying and decarbonizing the Company's fleet.  Euronav's acquisition of CMB.TECH is a strategic move for the future of the Company.  The Committee considers that it is important that Euronav must move towards decarbonisation."  ECF No. 27-21 at 8.

Moreover, Plaintiffs' allegation that CMB.TECH was purchased at a 9% premium, Compl. ¶4, misstates the conclusions in the Degroof fairness opinion, which is incorporated by reference into the Complaint.  As is common in fairness opinions, Degroof's analysis yielded a ***range of values*** for CMB.TECH: $1.105 billion to $1.435 billion, with a midpoint of $1.327 billion.  *See* ECF No. 27-17 at 56.  Thus, while the $1.15 billion price tag that Euronav paid for CMB.TECH was higher than the *lowest* end of that range, the price was well within the valuation range, and it represented a 13% discount to the midpoint, and a 19% discount to the high end.  *See id.*

---

[5] The Complaint also alleges unspecified "conflicts of interest" resulting from changes in control of Euronav.  Compl. ¶¶47, 64.  But "the securities laws focus on disclosure of the relevant underlying facts" and do not require "characteriz[ing] conflict of interest transactions with pejorative nouns or adjectives.'"  *In re PHLCORP Sec. Tender Offer Litig.*, 700 F. Supp. 1265, 1269–70 (S.D.N.Y. 1988).

Because all the material information needed for the tender offer was disclosed before the tender offer period expired, including the information Plaintiffs allege was omitted, their sole claim is moot and should be dismissed. *See, e.g.*, *Consol. Gold Fields*, 713 F. Supp. at 1474.

## II. PLAINTIFFS FAIL TO STATE A VIABLE SECTION 14(E) CLAIM

In addition to being moot, the Complaint should be dismissed for the independent reason that Plaintiffs fail to plead a viable claim. Plaintiffs' Section 14(e) claim requires them to plead with particularity: "(1) that the defendant made an untrue statement of fact or omitted to state a fact necessary to make statements made not misleading in connection with a tender offer; (2) that the misstatement or omission was material; and (3) that the defendant acted with either 'knowledge of falsity, or a reckless disregard for the truth.'" *Taro Pharm.*, 2010 WL 2835548, at *8. Indeed, claims under Section 14(e) are subject to a heightened pleading standard pursuant to Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *Id.* at *7. FourWorld's claim fails under any standard.

### A. Plaintiffs Cannot State a Section 14(e) Claim Based on Pricing

FourWorld's theory of the case is that the tender offer materials "contained materially false and misleading statements and omissions, which among other things, led to a depressed offering price for Euronav shares." Compl. ¶63. FourWorld's theory is legally insufficient to state a Section 14(e) claim.

To be clear, Section 14(e) deals solely with the adequacy of disclosures; it does not provide shareholders with a platform to complain about the financial or other terms of a tender offer. *See Schreiber v. Burlington N., Inc.*, 472 U.S. 1, 9, 11–12 (1985) (Section 14(e) is not "an invitation to the courts to oversee the substantive fairness of tender offers"). Indeed, as the Supreme Court has explained, "[n]owhere in the legislative history is there the slightest suggestion that § 14(e) serves any purpose other than disclosure," or that its terms "should be read as an invitation to the

courts to oversee the substantive fairness of tender offers; the quality of any offer is a matter for the marketplace." *Id.* at 12.

Courts in this district have dismissed Section 14(e) claims similarly centered on disclosures allegedly affecting the offer price. *See, e.g.*, *Wardrop*, 2001 WL 274067, at *4 ("Plaintiffs' claims that defendants failed to factor the WTO negotiations and agreement into the determination of the tender offer price are not allegations of nondisclosure."); *In re PHLCORP*, 700 F. Supp. at 1269 ("The allegation that defendants falsely characterized the tender offer price as fair and failed to disclose that it was unfair does not state a claim under § 14(e)."). The same result should follow here.

## B.      Plaintiffs Fail to Allege a Material Misstatement or Omission

To state a Section 14(e) claim, Plaintiffs must allege "that the defendant made an untrue statement of fact or omitted to state a fact necessary to make statements made not misleading in connection with a tender offer." *Taro Pharm.*, 2010 WL 2835548, at *8 (internal quotation marks omitted). "'[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor[.]'" *Soueidan v. Breeze-E. Corp.*, No. 16 Civ. 0015 (ER), 2017 WL 627456, at *5 (S.D.N.Y. Feb. 15, 2017) (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,* 575 U.S. 175, 186-87 (2015)). "Fair accuracy, not perfection, is the appropriate standard." *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195, 1200 (2d Cir. 1978).

To be material, there must be "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Halperin v. eBankerUSA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002); *Perrigo Co. PLC v. Mylan N.V.*, 2015 WL 9916726, at *4 (S.D.N.Y. Oct. 29, 2015). Disclosure is not required simply because additional information "may be relevant or of interest to a reasonable investor," *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002) (in context of

Section 14(a) claim), or "because a reasonable investor would very much like to know that fact." *Thesling v. Bioenvision, Inc.*, 374 F. App'x 141, 143 (2d Cir. 2010); *see also Sodhi v. Gentium S.P.A.*, No. 14-CV-287 (JPO), 2015 WL 273724, at *5 (S.D.N.Y. Jan. 22, 2015) (dismissing Section 14(e) claim). Nor are shareholders entitled to "disclosures sufficient to make [their] own independent assessment of a stock's value." *Sodhi*, 2015 WL 273724, at *5; *see also Macfadden Holdings, Inc. v. JB Acquisition Corp.*, 802 F.2d 62, 66 (2d Cir. 1986) (the statute "was not intended to remove all pressure or uncertainty from this inherently volatile…situation[.]").

As explained above, FourWorld has not—and cannot—identify any material misstatement or omission in the offering materials. *E.g.*, *Polar Int'l Brokerage Corp. v. Reeve*, 108 F. Supp. 2d 225, 239 (S.D.N.Y. 2000) (finding plaintiff's Section 14(e) claim was "plainly frivolous" where "the documents upon which plaintiffs rely in support of their argument were publicly disseminated prior to the Offer").

## C.     Plaintiffs Fail to Allege Scienter

Plaintiffs also fail to allege the requisite "intent to deceive." *Diamond v. Arend*, 649 F. Supp. 408, 412–13 (S.D.N.Y. 1986) (dismissing Section 14(e) claim). "To adequately allege scienter…a complaint must state with particularity facts giving rise to 'a strong inference' that the defendants acted with fraudulent intent…by alleging (i) facts that demonstrate defendants' motive and opportunity to commit fraud; or (ii) facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Polar*, 108 F. Supp. 2d at 236 n.20. This strong inference "must be 'at least as compelling as any opposing inference of nonfraudulent intent.'" *Iowa Pub. Emp.'s Ret. Sys. v. Deloitte & Touche LlP*, 919 F. Supp. 2d 321, 330–31 (S.D.N.Y. 2013), *aff'd*, 558 F. App'x 138 (2d Cir. 2014) (dismissing claim under Section 10(b) and Rule 10b-5). Plaintiffs have wholly failed to plead any facts that give rise to the inference that CMB acted with fraudulent intent to deceive investors by withholding allegedly material information.

As to motive and opportunity, Plaintiffs vaguely allege that the offering materials "were designed to deceive Euronav's stockholders into believing" that the tender offer price of $17.86 was based on the price that CMB paid for Frontline's Euronav shares. Compl. ¶1. But nowhere in the Complaint do Plaintiffs bother to plead *facts* that show CMB's motive for supposedly "deceiving" Euronav's shareholders into "believing" the provably true fact that the tender offer price, which was set pursuant to Belgian law, is the same price CMB paid Frontline for its Euronav's shares, minus dividends expressly permitted by the FSMA. *Compare id.* ¶36 (alleging "CMB acquired Frontline's (6.21%) and Frontline's affiliate Famatown's (19.91%) shares in Euronav for $18.43 per share"), *with id.* ¶59 (alleging "CMB was allowed by the Belgian regulator to deduct a dividend payment of $0.57 per share …, reducing the statutory minimum for the [mandatory tender offer] from $18.43 to $17.86.") and *id.* ¶60 (alleging "CMB launched the Tender Offer at $17.86 per share.").

Plaintiffs further, and still vaguely, allege CMB actually paid more for Frontline's Euronav shares than was disclosed, and "by concealing the truth, CMB seeks to avoid paying the same price to the minority shareholders." Compl. ¶1. This is nonsensical. Concealing "the truth" (or what is really a story Plaintiffs conjured up) from the offering materials would not help CMB "avoid" paying anything, because the offering materials have nothing to do with the calculation of the tender offer price. As Plaintiffs concede in their Complaint, the tender offer price was dictated by Belgian law and approved by the FSMA. *See id.* ¶59 (referring to "the statutory minimum" for the mandatory tender offer price as "allowed by the Belgian regulator"). To the extent Plaintiffs are trying to allege that CMB and Frontline somehow conspired to set a depressed tender offer price (which they did not), such an allegation is even more farfetched, less supported by the facts, and just as insufficient to establish scienter. *Tabak v. Can. Solar Inc.*, 549 F. App'x 24, 29 (2d

Cir. 2013) ("[T]he general motivation to act in one's own economic self-interest is insufficient to allege motive.").  Plaintiffs fail to show that CMB had any motive or opportunity to commit fraud.

As to conscious misbehavior or recklessness, the Complaint is similarly devoid of factual allegations that establish "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *Iowa Pub.*, 919 F. Supp. 2d at 331.  Accordingly, Plaintiffs fail to adequately allege scienter.

### D.     Plaintiffs Fail to Plead Damages

Under the Exchange Act, Plaintiffs carry the "burden of proving that the act or omission of the defendant alleged to violate [the Exchange Act] caused the loss for which [he/she] seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).  Thus, "to establish loss causation, a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (affirming dismissal of Section 10(b) claim).  But nowhere in the Complaint do Plaintiffs explain how any of the purported omissions caused a loss.  Plaintiffs' "damages" are based entirely on their theory that the tender offer price was incorrectly calculated, a subject that cannot be redressed under the guise of a Williams Act disclosure claim.  Rather, Plaintiffs must pursue whatever remedy they have in the Belgian proceedings they have already commenced.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Complaint should be dismissed in its entirety, with prejudice.

Dated: April 19, 2024
New York, New York

        FRIED, FRANK, HARRIS, SHRIVER
         & JACOBSON LLP

        By: _____ /s/ Michael C. Keats _____
                   Michael C. Keats

        Rebecca L. Martin
        One New York Plaza
        New York, New York 10004-1980
        (212) 859-8000
        michael.keats@friedfrank.com
        rebecca.martin@friedfrank.com

        *Attorneys for Defendant*
         *Belgische Scheepvaartmaatschappij-*
         *Compagnie Maritime Belge NV*